IN THE CIRCUIT COURT OF PIKE COUNTY, MISSISSIPPI

FILED
PIKE COUNTY, MISS

SEP 20 2011

ROGER A. GRAVES
CIRCUIT CLERK

BY_____

CITY OF MCCOMB                                                    **PLAINTIFF**

V.                                           CAUSE NO.: 11-211-PCS

SIEMENS BUILDING TECHNOLOGIES, INC.,
NOW KNOWN AS SIEMENS INDUSTRY, INC.,
AND SIEMENS PUBLIC, INC.                                    **DEFENDANTS**

TRIAL BY JURY

### COMPLAINT FOR DECLARATORY JUDGMENTS, DAMAGES, AND OTHER RELIEF

COMES NOW the Plaintiff, City of McComb, Mississippi, and files its Complaint for Declaratory Judgments, Damages, and Other Relief, against the Defendants, Siemens Building Technologies, Inc., now known as Siemens Industry, Inc., and Siemens Public, Inc., and demanding trial by jury, the Plaintiff would show the following:

1.    At all relevant times, Plaintiff municipality was, and is, a municipal corporation organized and existing under the laws of the State of Mississippi. This case is filed by specific authority given by its Board of Mayor and Selectmen.

2.    At all relevant times, Siemens Building Technologies, Inc., was a corporation organized and existing under the laws of the State of Illinois, which corporation was, on October 1, 2009, merged with Siemens Entergy & Automation, Inc., under the name of Siemens Industry, Inc., which successor corporation is qualified to transact business in the State of Mississippi with the office of the Secretary of State, and has appointed as its agent for service of process, CT Corporation Systems, 645 Lakeland East Drive, Ste. 101, Flowood, Mississippi 39232

1

**EXHIBIT "A" - Page 1**

3. The Defendant Siemens Public, Inc., is a corporation existing under the laws of the State of Illinois, which is qualified to transact business in the State of Mississippi, and has appointed CT Corporation System as its agent for service of process.

4. On June 9, 2009, the Defendant Siemens Industry, Inc., known at that time as Siemens Building Technologies, Inc., contracted with the Plaintiff to provide an automated meter infrastructure system. Under its contract Siemens agreed to complete the fixed base system by July 31, 2010, for a contract price of Four Million Five Hundred Fifty-Eight Thousand Nine Hundred Thirteen Dollars ($4,558,913.00). It was the intent of the contract that the Siemens would provide complete installation of a fixed base radio read water meter reading system, to be used by the public works department of the Plaintiff in the ordinary course of business for billing water customers.

5. In an amendment to the contract agreement, which amendment was dated November 24, 2009, Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., agreed and guaranteed that the Plaintiff's increase in billable water, through more accurate measurement, will be equal to or exceed the total project costs or attributable indebtedness would be paid by Siemens.

6. The Defendant Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., agreed and contracted that it would comply with all Mississippi statutes regarding public works contracts, particularly Section 31-5-51, which required the Defendant to furnish a performance bond in favor of and for the protection of the Plaintiff. The Defendant, Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., failed or refused to provide such bond, as required by law.

7. The Defendant Siemens Industry, Inc., formerly known as Siemens Building

2

**EXHIBIT "A" - Page 2**

billable water, through more accurate measurement, would be equal to or exceed the total project cost.

8. The Defendant Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., has materially and substantially breached its contract as follows:

(a) It has failed or refused to provide ten percent (10%) drive by system no later than September 6, 2009.

(b) It has failed or refused to provide a forty percent (40%) complete drive by system by October 16, 2009.

(c) The Defendant has failed or refused to provide an eighty percent (80%) complete drive by system by December 2, 2009.

(d) The Defendant has failed or refused to provide a ninety-five percent (95%) complete drive by system by December 18, 2009.

(e) The Defendant has failed or refused to provide a one hundred percent (100%) complete drive by system by January 5, 2010.

(f) The Defendant has failed or refused to provide complete migration to fix based system by July 31, 2010, as required by its contract.

9. The Defendant Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., has failed or refused to perform testing and analysis as described in the M&V plan, and has failed or refused to provide an annual M&V report each year, has failed or refused to provide one annual review of M&V report with Plaintiff's staff, has failed or refused to perform the pulling, replacement, testing and analysis as described in the M&V plan, has failed or refused to provide the automated meter read software maintenance and updates.

3

**EXHIBIT "A" - Page 3**

10.    As a result of the delayed above-referenced, Siemens Industry, Inc., is in default on both its performance, warranty and guarantee obligations under the contract.

11.    In breach of its duties, Siemens Industry Inc., was reckless, negligent and careless in the discharge of its contract.   The project will not in any way meet the requirements of Plaintiff as a municipality.  In addition, the Defendant Siemens' negligent acts and omissions has caused extensive damage to existing facilities, numerous interruption of services, and other failure events at considerable expense and aggravation to municipality and its residents.

12.    As a direct result of the misrepresentations by Siemens Industry, Inc., formerly Siemens Building Technologies, as to its abilities and its complete inadequacy in performing its obligations under the contracts and amendment, the Plaintiff has been damaged.

13    As a result of the complete failure by Siemens Industry to perform its obligation under its contract, with amendments, the contract has been materially and substantially breached. and the Plaintiff seeks a declaratory judgment of this court finding and declaring that the Plaintiff has no further obligation imposed on it by its contract with Siemens Industry, Inc., formally known as Siemens Building Technology.

14    On December 21, 2009, the Plaintiff entered a Master Lease Purchase Agreement with the Defendant, Siemens Public, Inc.  Under the agreement, Siemens Public. as lessor, agreed to lease to the Plaintiff, City of McComb, Mississippi as lessee. the equipment associated with the automated water meter reading system.

15.    By a contract addendum, the Plaintiff and Siemens Public agreed that the continuation of the lease/purchase agreement was contingent upon the appropriation of

4

funds by the Board of Mayor and Selectmen to make the lease payments. The contract amendment further provided that if the Board of Mayor and Selectmen failed to appropriate sufficient funds to provide for the continuation of the lease payments, the lease and the obligations of the Plaintiffs, City of McComb, to make such lease payments were to terminate on the last day of the fiscal year for which appropriations were made.

16.     The Plaintiff, by its Board of Mayor and Selectmen, did not make an appropriation of funds to make lease payment for the fiscal year commencing October 1, 2011, and ending September 30, 2012.

17      Because of the actions of the Board of Mayor and Selectmen, by its refusal to appropriate sufficient funds to provide for the continuation of the lease payments during the fiscal year beginning October 1, 2011, all obligation for lease payment under the Master Lease Purchase Agreement dated December 21, 2009 are to terminate on the last day of the 2010 fiscal year being September 30, 2011.

18.     The Plaintiff, City of McComb, Mississippi is entitled to a DeclaratoryJudgment of this court finding and declaring that the Master Lease Purchase Agreement dated December 21, 2009 between Siemens Public, Inc., and the Plaintiff, City of McComb, Mississippi is terminated effective the last day of the 2010 fiscal year, being September 30, 2011.

WHEREFORE, the Plaintiff files its Complaint seeking the following relief, to which it is entitled:

(a)     Declaratory Judgment against Siemens Industry, Inc., formerly Siemens Technologies, Inc    That the contract dated June 9, 2009 has been materially and substantially breached by Siemens Industry, Inc., and that the City of McComb, Mississippi

**EXHIBIT "A" - Page 5**

has no further obligation or duties owing to Siemens Industry;

(b)  An award of damages in an amount to be shown at the trial of this case proximately caused by the material breach by Siemens Industry, Inc.;

(c)  A Declaratory Judgment of this Court that by virtue of the non-appropriation of funds by the Board of Mayor and Selectmen, as contemplated by Section 31-7-13, Mississippi Code Annotated, the obligations of the City of McComb, Mississippi to make lease payments under the Master Lease Purchase Agreement dated December 21, 2009, by and between McComb and Siemens Public, Inc., are and have been terminated.

CITY OF MCCOMB, MISSISSIPPI

BY: _____
OF COUNSEL

WAYNE DOWDY, MSB #6177
DOWDY COCKERHAM & WATT
ATTORNEYS AT LAW
215 East Bay Street
Post Office Box 30
Magnolia, Mississippi 39652
(601) 783-6600

6

**EXHIBIT "A" - Page 6**

## In the Circuit Court of the 14th Judicial District Of Pike County, Mississippi

I, Roger A. Graves, Circuit Clerk of the Circuit & County Court of Pike County, Mississippi, hereby certify that the foregoing constitutes a true and correct copy of the entire file in Cause Number <u>11-211-PCS</u> Circuit Court Docket of the Circuit Court of Pike County, Mississippi, in cause styled:

## CITY OF MCCOMB
## V
## SIEMENS BUILDING TECHNOLOGIES, INC., NOW KNOW AS SIEMENS INDUSTRY, INC., AND SIEMENS PUBLIC, INC.

and containing the following documents:

1. Complaint

Given under my hand and seal of office, this date September 30, 2011.

Roger A. Graves, Circuit Clerk
Pike County, Mississippi

By: _____

# COVER SHEET
## Civil Case Filing Form
*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court      Form AOC/01
Administrative Office of Courts      (Rev 2009)

**Court Identification Docket #**

| 5 | 7 | | | C | 1 | |
|---|---|---|---|---|---|---|
| County # | | Judicial District | | Court ID (CH, CI, CO) | | |

| 0 | 9 | 2 | 0 | 1 | 1 |
|---|---|---|---|---|---|
| Month | | Date | | Year | |

**Case Year**

| 2 | 0 | 1 | 1 |
|---|---|---|---|

**Docket Number**

| 0 | 0 | 2 | 1 | 1 |
|---|---|---|---|---|

| | |
|---|---|

Local Docket ID

This area to be completed by clerk

Case Number if filed/prior to 1/1/94

In the _____ Court of _____ County — ____ Judicial District

**Origin of Suit (Place an "X" in one box only)**

- [X] Initial Filing
- [ ] Reinstated
- [ ] Remanded
- [ ] Reopened
- [ ] Foreign Judgment Enrolled
- [ ] Joining Suit/Action
- [ ] Transfer from Other court
- [ ] Appeal
- [ ] Other

**Plaintiff - Party(ies) Initially Bringing Suit Should Be Entered First - Enter Additional Plaintiffs on Separate Form**

Individual

| Last Name | First Name | Maiden Name, if applicable | M.I. | Jr/Sr/III/IV |
|---|---|---|---|---|

____ Check ( x ) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of

____ Check ( x ) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency

Business   City of McComb, Mississippi

Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

____ Check ( x ) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A

Address of Plaintiff

Attorney (Name & Address)   Wayne Dowdy, Post Office Box 30, Magnolia, Mississippi 39652     MS Bar No. 6177

____ Check ( x ) if Individual Filing Initial Pleading is NOT an attorney

Signature of Individual Filing: _____

**Defendant - Name of Defendant - Enter Additional Defendants on Separate Form**

Individual

| Last Name | First Name | Maiden Name, if applicable | M.I. | Jr/Sr/III/IV |
|---|---|---|---|---|

____ Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of

____ Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency

Business   Siemens Building Technologies, Inc.,

Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

____ Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A

Attorney (Name & Address) - If Known      MS Bar No.

**Damages Sought:** Compensatory $ _____ Punitive $ _____    Check ( x ) if child support is contemplated as an issue in this suit.*
*If checked, please submit completed Child Support Information Sheet with this Cover Sheet

**Nature of Suit (Place an "X" in one box only)**

| Domestic Relations | Business/Commercial | Children/Minors - Non-Domestic | Real Property |
|---|---|---|---|
| [ ] Child Custody/Visitation | [ ] Accounting (Business) | [ ] Adoption - Contested | [ ] Adverse Possession |
| [ ] Child Support | [ ] Business Dissolution | [ ] Adoption - Uncontested | [ ] Ejectment |
| [ ] Contempt | [ ] Debt Collection | [ ] Consent to Abortion Minor | [ ] Eminent Domain |
| [ ] Divorce:Fault | [ ] Employment | [ ] Removal of Minority | [ ] Eviction |
| [ ] Divorce: Irreconcilable Diff. | [ ] Foreign Judgment | [ ] Other | [ ] Judicial Foreclosure |
| [ ] Domestic Abuse | [ ] Garnishment | **Civil Rights** | [ ] Lien Assertion |
| [ ] Emancipation | [ ] Replevin | [ ] Elections | [ ] Partition |
| [ ] Modification | [ ] Other | [ ] Expungement | [ ] Tax Sale: Confirm/Cancel |
| [ ] Paternity | **Probate** | [ ] Habeas Corpus | [ ] Title Boundary or Easement |
| [ ] Property Division | [ ] Accounting (Probate) | [ ] Post Conviction Relief/Prisoner | [ ] Other |
| [ ] Separate Maintenance | [ ] Birth Certificate Correction | [ ] Other | **Torts** |
| [ ] Termination of Parental Rights | [ ] Commitment | **Contract** | [ ] Bad Faith |
| [ ] UIFSA (eff 7/1/97; formerly URESA) | [ ] Conservatorship | [ ] Breach of Contract | [ ] Fraud |
| [ ] Other | [ ] Guardianship | [ ] Installment Contract | [ ] Loss of Consortium |
| **Appeals** | [ ] Heirship | [ ] Insurance | [ ] Malpractice - Legal |
| [ ] Administrative Agency | [ ] Intestate Estate | [ ] Specific Performance | [ ] Malpractice - Medical |
| [ ] County Court | [ ] Minor's Settlement | [ ] Other | [ ] Mass Tort |
| [ ] Hardship Petition (Driver License) | [ ] Muniment of Title | **Statutes/Rules** | [ ] Negligence - General |
| [ ] Justice Court | [ ] Name Change | [ ] Bond Validation | [ ] Negligence - Motor Vehicle |
| [ ] MS Dept Employment Security | [ ] Testate Estate | [ ] Civil Forfeiture | [ ] Product Liability |
| [ ] Worker's Compensation | [ ] Will Contest | [X] Declaratory Judgment | [ ] Subrogation |
| [ ] Other | [ ] Other | [ ] Injunction or Restraining Order | [ ] Wrongful Death |
| | | [ ] Other | [ ] Other |



**EXHIBIT "B" - Page 2**



# DOWDY COCKERHAM & WATT
LAWYERS

215 EAST BAY STREET   POST OFFICE BOX 30   MAGNOLIA, MISSISSIPPI 39652   (601) 783-6600   FAX (601) 783-3070

WAYNE DOWDY
ANGELA COCKERHAM*
DUNBAR DOWDY WATT
*ALSO LICENSED IN LOUISIANA

September 20, 2011

> **FILED**
> PIKE COUNTY, MISS
>
> SEP 20 2011
>
> ROGER A. GRAVES
> CIRCUIT CLERK
> BY_____

Honorable Roger Graves
Circuit Clerk
Post Office Box 31
Magnolia, Mississippi 39652

Re:    City of McComb v. Siemens Building Technologies
       In the Circuit Court of Pike County, Mississippi

Dear Mr. Graves:

Enclosed please find for filing the original and one copy of the Complaint, and Summons in the referenced matter.  Please return a "Filed" stamped copy to me in the enclosed self-addressed, stamped envelope.

Thank you for your assistance in this matter.

Sincerely,

Wayne Dowdy

WD/ce

cc:    Honorable Michael M. Taylor
       Edwin L. Bean, Jr., Esquire
       L. Clark Hicks, Jr., Esquire

Enclosure

**EXHIBIT "B" - Page 3**

FILED
PIKE COUNTY, MISS

SEP 20 2011

ROGER A. GRAVES
CIRCUIT CLERK
BY

IN THE CIRCUIT COURT OF PIKE COUNTY, MISSISSIPPI

CITY OF MCCOMB                                                      **PLAINTIFF**

V.                                                 CAUSE NO.: 11-211-PCS

SIEMENS BUILDING TECHNOLOGIES, INC.,
NOW KNOWN AS SIEMENS INDUSTRY, INC.,
AND SIEMENS PUBLIC, INC.                                  **DEFENDANTS**

<u>TRIAL BY JURY</u>

<u>COMPLAINT FOR DECLARATORY JUDGMENTS,
DAMAGES, AND OTHER RELIEF</u>

COMES NOW the Plaintiff, City of McComb, Mississippi, and files its Complaint for

Declaratory Judgments, Damages, and Other Relief, against the Defendants, Siemens

Building Technologies, Inc., now known as Siemens Industry, Inc., and Siemens Public,

Inc., and demanding trial by jury, the Plaintiff would show the following:

1.      At all relevant times, Plaintiff municipality was, and is, a municipal corporation

organized and existing under the laws of the State of Mississippi. This case is filed by

specific authority given by its Board of Mayor and Selectmen.

2.      At all relevant times, Siemens Building Technologies, Inc., was a corporation

organized and existing under the laws of the State of Illinois, which corporation was, on

October 1, 2009, merged with Siemens Entergy & Automation, Inc., under the name of

Siemens Industry, Inc., which successor corporation is qualified to transact business in the

State of Mississippi with the office of the Secretary of State, and has appointed as its agent

for service of process, CT Corporation Systems, 645 Lakeland East Drive, Ste. 101,

Flowood, Mississippi 39232

1

**EXHIBIT "B" - Page 4**

3.  The Defendant Siemens Public, Inc., is a corporation existing under the laws of the State of Illinois, which is qualified to transact business in the State of Mississippi, and has appointed CT Corporation System as its agent for service of process.

4.  On June 9, 2009, the Defendant Siemens Industry, Inc., known at that time as Siemens Building Technologies, Inc., contracted with the Plaintiff to provide an automated meter infrastructure system. Under its contract Siemens agreed to complete the fixed base system by July 31, 2010, for a contract price of Four Million Five Hundred Fifty-Eight Thousand Nine Hundred Thirteen Dollars ($4,558,913.00). It was the intent of the contract that the Siemens would provide complete installation of a fixed base radio read water meter reading system, to be used by the public works department of the Plaintiff in the ordinary course of business for billing water customers.

5.  In an amendment to the contract agreement, which amendment was dated November 24, 2009, Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., agreed and guaranteed that the Plaintiff's increase in billable water, through more accurate measurement, will be equal to or exceed the total project costs or attributable indebtedness would be paid by Siemens.

6.  The Defendant Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., agreed and contracted that it would comply with all Mississippi statutes regarding public works contracts, particularly Section 31-5-51, which required the Defendant to furnish a performance bond in favor of and for the protection of the Plaintiff. The Defendant, Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., failed or refused to provide such bond, as required by law.

7.  The Defendant Siemens Industry, Inc., formerly known as Siemens Building

2

billable water, through more accurate measurement, would be equal to or exceed the total project cost.

8.     The Defendant Siemens Industry, Inc., formerly known as Siemens Building Technologies, Inc., has materially and substantially breached its contract as follows:

(a)     It has failed or refused to provide ten percent (10%) drive by system no later than September 6, 2009.

(b)     It has failed or refused to provide a forty percent (40%) complete drive by system by October 16, 2009.

(c)     The Defendant has failed or refused to provide an eighty percent (80%) complete drive by system by December 2, 2009.

(d)     The Defendant has failed or refused to provide a ninety-five percent (95%) complete drive by system by December 18, 2009.

(e)     The Defendant has failed or refused to provide a one hundred percent (100%) complete drive by system by January 5, 2010.

(f)     The Defendant has failed or refused to provide complete migration to fix based system by July 31, 2010, as required by its contract.

9.     The Defendant Siemens Industry, Inc.,formerly known as Siemens Building Technologies, Inc., has failed or refused to perform testing and analysis as described in the M&V plan, and has failed or refused to provide an annual M&V report each year, has failed or refused to provide one annual review of M&V report with Plaintiff's staff, has failed or refused to perform the pulling, replacement, testing and analysis as described in the M&V plan, has failed or refused to provide the automated meter read software maintenance and updates.

3

10. As a result of the delayed above-referenced, Siemens Industry, Inc., is in default on both its performance, warranty and guarantee obligations under the contract.

11. In breach of its duties, Siemens Industry Inc., was reckless, negligent and careless in the discharge of its contract. The project will not in any way meet the requirements of Plaintiff as a municipality. In addition, the Defendant Siemens' negligent acts and omissions has caused extensive damage to existing facilities, numerous interruption of services, and other failure events at considerable expense and aggravation to municipality and its residents.

12. As a direct result of the misrepresentations by Siemens Industry, Inc., formerly Siemens Building Technologies, as to its abilities and its complete inadequacy in performing its obligations under the contracts and amendment, the Plaintiff has been damaged.

13. As a result of the complete failure by Siemens Industry to perform its obligation under its contract, with amendments, the contract has been materially and substantially breached, and the Plaintiff seeks a declaratory judgment of this court finding and declaring that the Plaintiff has no further obligation imposed on it by its contract with Siemens Industry, Inc., formally known as Siemens Building Technology.

14. On December 21, 2009, the Plaintiff entered a Master Lease Purchase Agreement with the Defendant, Siemens Public, Inc. Under the agreement, Siemens Public, as lessor, agreed to lease to the Plaintiff, City of McComb, Mississippi as lessee, the equipment associated with the automated water meter reading system.

15. By a contract addendum, the Plaintiff and Siemens Public agreed that the continuation of the lease/purchase agreement was contingent upon the appropriation of

4

funds by the Board of Mayor and Selectmen to make the lease payments. The contract amendment further provided that if the Board of Mayor and Selectmen failed to appropriate sufficient funds to provide for the continuation of the lease payments, the lease and the obligations of the Plaintiffs, City of McComb, to make such lease payments were to terminate on the last day of the fiscal year for which appropriations were made.

16.     The Plaintiff, by its Board of Mayor and Selectmen, did not make an appropriation of funds to make lease payment for the fiscal year commencing October 1, 2011, and ending September 30, 2012.

17.     Because of the actions of the Board of Mayor and Selectmen, by its refusal to appropriate sufficient funds to provide for the continuation of the lease payments during the fiscal year beginning October 1, 2011, all obligation for lease payment under the Master Lease Purchase Agreement dated December 21, 2009 are to terminate on the last day of the 2010 fiscal year being September 30, 2011.

18.     The Plaintiff, City of McComb, Mississippi is entitled to a DeclaratoryJudgment of this court finding and declaring that the Master Lease Purchase Agreement dated December 21, 2009 between Siemens Public, Inc., and the Plaintiff, City of McComb, Mississippi is terminated effective the last day of the 2010 fiscal year, being September 30, 2011.

WHEREFORE, the Plaintiff files its Complaint seeking the following relief, to which it is entitled:

(a)     Declaratory Judgment against Siemens Industry, Inc., formerly Siemens Technologies, Inc. That the contract dated June 9, 2009 has been materially and substantially breached by Siemens Industry, Inc., and that the City of McComb, Mississippi

5

has no further obligation or duties owing to Siemens Industry;

(b)     An award of damages in an amount to be shown at the trial of this case proximately caused by the material breach by Siemens Industry, Inc.;

(c)     A Declaratory Judgment of this Court that by virtue of the non-appropriation of funds by the Board of Mayor and Selectmen, as contemplated by Section 31-7-13, Mississippi Code Annotated, the obligations of the City of McComb, Mississippi to make lease payments under the Master Lease Purchase Agreement dated December 21, 2009, by and between McComb and Siemens Public, Inc., are and have been terminated.

CITY OF MCCOMB, MISSISSIPPI

BY: _____
OF COUNSEL

WAYNE DOWDY, MSB #6177
DOWDY COCKERHAM & WATT
ATTORNEYS AT LAW
215 East Bay Street
Post Office Box 30
Magnolia, Mississippi 39652
(601) 783-6600

6

**EXHIBIT "B" - Page 9**

CITY OF McCOMB                                    )
                                                  )
         Plaintiff,                               )
                                                  )         CIVIL ACTION FILE
v.                                                )         NO.
                                                  )
SIEMENS BUILDING TECHNOLOGIES, INC.,              )
NOW KNOWN AS SIEMENS INDUSTRY, INC.,              )
AND SIEMENS PUBLIC, INC.                          )
                                                  )
         Defendants.                        ·     )
                                                  )

## SIEMENS PUBLIC, INC. NOTICE OF JOINDER TO REMOVAL

TO:    All Counsel of Record

Please take notice that the defendant, Siemens Public, Inc., hereby joins in and consents to the removal of this action from the Circuit Court of Pike County, Mississippi, to the United States District Court for the Southern District of Mississippi, Jackson Division, upon all grounds set forth in the Notice of Removal filed in this action which is incorporated herein by reference.

Defendant's joinder in the notice shall not be interpreted as a waiver or relinquishment of the rights of Removing Defendants to assert any defenses available, including, but not limited to: (1) lack of subject matter jurisdiction; (2) lack of personal jurisdiction; (3) improper venue; (4) insufficiency of process; (5) insufficiency of service of process; (6) failure to state a claim upon which relief can be granted; (7) failure to join a party under Rule 19; or (8) any other pertinent defense.

**EXHIBIT "C" - Page 1**

This  6th   day of October, 2011

Angela M. Spivey
Mississippi Bar No. 10572
McGuireWoods LLP
1230 Peachtree Street, NE
Promenade II, Suite 2100
Atlanta, Georgia  30309-3534
(404) 443-5720 (Telephone)
(404) 443-5792 (Facsimile)
aspivey@mcguirewoods.com

*Attorneys for Siemens Public, Inc.*

2

**EXHIBIT "C" - Page 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

CITY OF McCOMB                                )
                                              )
            Plaintiff,                        )
                                              )        CIVIL ACTION FILE
v.                                            )        NO.
                                              )
SIEMENS BUILDING TECHNOLOGIES, INC.,          )
NOW KNOWN AS SIEMENS INDUSTRY, INC.,          )
AND SIEMENS PUBLIC, INC.                      )
                                              )
            Defendants.                       )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that on October __6__, 2011, I electronically filed the foregoing *Notice of Joinder to Removal* with the Clerk of the Court using the CM/ECF System and served a true and correct copy of same on counsel for Plaintiff via First-Class Mail, postage prepaid, addressed to:

Wayne Dowdy
Dowdy Cockerham & Watt
215 East Bay Street
Post Office Box 30
Magnolia, Mississippi 39652

Angela M. Spivey

**EXHIBIT "C" - Page 3**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | | |
|---|---|---|
| CITY OF MCCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | |
| SIEMENS INDUSTRY, INC., f/k/a | ) | NO. _____ |
| SIEMENS BUILDING | ) | |
| TECHNOLOGIES, INC., and | ) | |
| SIEMENS PUBLIC, INC., | ) | |
| | ) | |
| Defendants. | ) | |

| | |
|---|---|
| STATE OF MISSISSIPPI | ) |
| | ) |
| COUNTY OF RANKIN | ) · |

## <u>AFFIDAVIT OF EARL BYRD</u>

Personally appeared before the undersigned officer duly authorized by law to administer oaths, EARL BYRD, who being duly sworn, states under oath as follows:

1.     I am over the age of 21, suffering from no known disabilities, and am otherwise competent to testify.  I have personal knowledge of the facts stated herein, and they are true.

2.     I am an area sales manager for Siemens Industry, Inc. ("SII), and in October 2010, I became personally involved in the administration of the

performance contracting agreement between SII and the City of McComb entered into on or about June 9, 2009 (the "Contract). A true and accurate copy of the Contract is attached hereto as Exhibit 1.

3.      Pursuant to the Contract, SII agreed to furnish services, supplies, and materials for the installation of an automated water meter system for the City of McComb in exchange for payment in the amount of $4,558,913.00.

4.      As of the date of this affidavit, the City of McComb had only paid SII 3,591,975.20 under the Contract.

5.      As of the date of this affidavit, a balance of $966,937.80 is remaining to be paid by the City of McComb to SII under the Contact.

FURTHER AFFIANT SAITH NOT

*Earl Byrd*

EARL BYRD

Sworn to and subscribed before me this _3rd_ day of October 2011 and notarized by me on said date.

*Avis Scott*

Notary Public

My commission expires:

_5-18-15_

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 85128
AVIS A. SCOTT
Commission Expires
May 18, 2015
RANKIN COUNTY

# PERFORMANCE CONTRACTING AGREEMENT
**between**

**and**

## Siemens Building Technologies, Inc.

TABLE OF ARTICLES

1. Agreement
2. Glossary
3. General
4. Performance Guarantee
5. Work by SIEMENS
6. The CLIENT'S Responsibility
7. Changes and Delays
8. Compensation
9. Acceptance
10. Insurance and Allocation of Risk
11. Hazardous Material Provisions
12. Miscellaneous Provisions
13. Maintenance Services Technical Support Program

# PERFORMANCE CONTRACTING AGREEMENT

Number: 440P- 057130

**Article 1**
**AGREEMENT**

This **AGREEMENT**, is made this 9th day of **June, 2009** by and between Siemens Building Technologies, Inc., ("SIEMENS") and the party identified below as the CLIENT.

**The CLIENT: City of McComb, MS**
**115 3rd Street**
McComb, MS 39648

DESIGNATED REPRESENTATIVE: **Zachary Patterson - Mayor**
PHONE: (601)684-4000  FAX: (601)684-

**Siemens Building Technologies, Inc.**
1000 Deerfield Parkway
Buffalo Grove, Illinois 60018

**With offices at:**
150 Teal Street, Suite 100
St. Rose, LA 70087
1018 N. Flowood Drive
Flowood, MS 39232

DESIGNATED REPRESENTATIVE: **Anthony (Tony) P. Ardillo, Jr.**
PHONE: (504)-466-9300 Cell: (504)331-5245      FAX: (504)464-6800

For services in connection with the following project:

**Project** Guaranteed Water Meter Performance Contract/Project



# PERFORMANCE CONTRACTING AGREEMENT

**Articles and Attachments**

This Agreement shall consist of this document which includes the following thirteen articles and indicated Exhibits ("Contract ocuments") which are acknowledged by the CLIENT and SIEMENS and incorporated herein by this reference:

Articles
1. Agreement
2. Glossary
3. General
4. Performance Guarantee
5. Work BY SIEMENS
6. The CLIENT'S Responsibility
7. Changes and Delays
8. Compensation
9. Acceptance
10. Insurance and Allocation of Risk
11. Hazardous Material Provisions
12. Miscellaneous Provisions
13. Maintenance Services Technical Support Program

Exhibits

| | |
|---|---|
| Exhibit A | Scope of Work and Services |
| Exhibit B | Payment Schedule(s) |
| Exhibit C | Performance Assurance |
| Attachment 1 | Account List |
| Attachment 2 | Testing Results |
| Attachment 3 | Annual Consumption Totals |
| Attachment 4 | Water Rate Structures |
| Attachment 5 | Product Specifications |

This Agreement, when accepted in writing by an authorized representative of the CLIENT and by an authorized representative of SIEMENS, constitutes the entire, complete and exclusive agreement between the Parties. The above documents constitute the entire Agreement between the CLIENT and SIEMENS relative to the project scope as stated in Exhibit A and supersede all prior and contemporaneous negotiations, statements, representations, agreements, letters of intent, awards, or proposals, either written or oral relative to the same. This Agreement may be modified only by a written instrument signed by both Parties.

**COMPENSATION/TERMS OF PAYMENT:**

As full consideration for the performance of the Work and Services set forth in Exhibit A and for the Performance Assurance set forth in Exhibit C, the CLIENT shall pay to SIEMENS the Contract Sum in such manner as agreed in Exhibit B and in accordance with the payment terms and conditions established by the Contract Documents.

Agreed for   The City of McComb, Mississippi

(Signature) by: _Zach Patton_

Print Name and Title: _ZACHARY PATTERSON, MAYOR_

approved by legal
molly m. foley

Agreed for Siemens Building Technologies, Inc.

(Signature) by: _Pete_

PETER KAMPS
VICE PRESIDENT
FINANCE & BUSINESS ADMINISTRATION

NAME: _____

TITLE: _____ Keith E. Graham
Counsel

DATE: _____

Print Name and Title: _____

(Signature) by: _____

Print Name and Title: _____

**Article 2**
**Glossary**

The following terms shall, for all purposes of the Contract Documents comprising this Agreement, have the meanings stated herein, unless the context otherwise specifies or requires, or unless otherwise defined in the Contract Documents:

*"Acceptance"* means the CLIENT has signed the Certificate of Substantial Completion.

*"Acceptance Date"* means the date on which the CLIENT signs the Certificate of Substantial Completion.

*"Accumulated Realized Savings"* means the sum of the actual savings achieved from the Effective Contract Date of this Agreement through the end of the current Annual Period, derived from the sum of the Measured & Verified Savings plus the Stipulated Savings.

*"Accumulated Guaranteed Savings"* means the sum of the Guaranteed Measured & Verified Savings plus the Stipulated Savings from the Guarantee Date of the Agreement through the end of the current Annual Period.

*"Annual Guaranteed Savings"* are the Measured & Verified Savings and the Stipulated Savings that occur in any Annual Period of the Guarantee Term.

*"Annual Period"* means a twelve (12) month period beginning on the Guarantee Date or on any anniversary date thereof.

*"Baseline"* means a period of time or multiple periods of time that have occurred prior to project commencement, which has been agreed upon and is set forth in Exhibit C. The energy usage, operating practices, and facility and equipment in place during such time period represents the basis against which all future energy and operating usage will be compared in order to determine the Accumulated Realized Savings.

*"BTU"* a unit of thermal energy defined as a British Thermal Unit.

*"Certificate of Substantial Completion"* means documentation executed by the CLIENT agreeing that the Work, or a designated portion of the Work, is Substantially Complete in accordance with the Agreement and such Work is accepted by the CLIENT.

*"CLIENT Representative"* means the person identified to SIEMENS by the CLIENT as the person authorized to make decisions on behalf of the CLIENT as set forth in Section 6.1(a) hereof.

*"Construction Period"* means the period between the Effective Contract Date and the first day of the month following the Substantial Completion Date.

*"Construction Period Savings"* means the actual accumulated Measured & Verified Savings plus the Stipulated Savings achieved from the Effective Contract Date of this Agreement until the Guarantee Date.

*"Contracted Baseline"* means the future annual period or multiple annual periods post-FIM implementation agreed upon and stated in Exhibit C that define the energy usage, operating practices, and facility and equipment in place post-FIM implementation and represents the basis on which the Guaranteed Savings are calculated.

*"Deliverable"* means a report or drawing specifically prepared for and deliverable to the CLIENT pursuant to the terms hereof.

*"Effective Contract Date"* is the date appearing at the top of this contract, unless specifically indicated otherwise.

*"Energy Conservation Measure"* or *"ECM"* means the equipment, devices, materials and/or software as installed by SIEMENS at the Facilities, or as repaired or replaced by the CLIENT hereunder, for the purpose of improving the efficiency of utility consumption.

# PERFORMANCE CONTRACTING AGREEMENT

**"Equipment"** means the installed products to be provided by SIEMENS as described in the Scope of Work and Services, Exhibit A.

**"Escalation Factor"** means an annual escalation percentage to be applied to the previous year's Energy Savings, Operational Savings and Technical Support Program, beginning and occurring on dates outlined in Performance Assurance, Exhibit C.

**"Facility"** or **"Facilities"** means the building(s) or structure(s) where Work will be installed or implemented. It shall have the same meaning as the term "Site".

**"Facility Improvement Measures"** or **"FIMs"** means the methods, techniques, application of know-how, installation of devices or otherwise, described in the Scope of Work and Services, Exhibit A, that are undertaken by SIEMENS as a result of this Agreement with the intent of generating net savings or efficiencies at or in connection with the operation of the Facilities, including without limitation the ECMs, OIMs, TIMs, USMs, WCMs, SCMs and any other, non-conservation-related activities, means or methods.

**"Guarantee Date"** means the date on which the CLIENT executes the final Certificate of Substantial Completion, thus indicating that the Construction Period is complete.

**"Guaranteed Measured & Verified Savings"** means the Measured & Verified Savings guaranteed to be achieved as described in the Performance Assurance, Exhibit C.

**"Guaranteed Savings"** means the amount of savings that this Agreement anticipates will be achieved at the Facilities defined in this Agreement, calculated as the aggregate of the Measured & Verified Savings and the Stipulated Savings amounts identified in the Performance Assurance, Exhibit C, but shall not exceed the aggregate of the Contract Sum; the Performance Assurance TSP Payments; and the CLIENT'S cost of financing the Work.

**"Instruments"** means all reports, notes, calculations, data, drawings, estimates, specifications, manuals, documents, excluding Deliverables, all computer programs, codes and computerized materials prepared by or for SIEMENS are instruments of SIEMENS' work.

**"kW" and "kWh"** means kilowatt and kilowatt hour, respectively.

**"Maintenance Services TSP"** means the Services performed under a Technical Support Program as stated in the Scope of Work and Services, Exhibit A.

**"Material Change"** means an event causing a 1% deviation in the Contracted Baseline.

**"Measured and Verified Savings"** means those savings that can be measured and verified by the methodology as set forth in Performance Assurance, Exhibit C.

**"Operational Improvement Measure"** or **"OIM"** means the programs, practices, methodologies, devices, materials and/or software as installed or instituted by SIEMENS at the Facilities, or as instituted by the CLIENT hereunder, for the purpose of improving the efficiency of operations activities, operational costs and/or operational results as described in the Scope of Work and Services Exhibit A.

**"Parties"** means the CLIENT and SIEMENS.

**"Performance Assurance"** is the process of ascertaining that the FIMs defined in Scope of Work and Services, Exhibit A, are performing at the guaranteed values that are defined in Performance Assurance, Exhibit C.

**"Performance Assurance TSP"** means the Services performed to monitor and report the performance relative to the guarantees defined in Performance Assurance, Exhibit C.

**"Performance Guarantee"** means the result of the Performance Assurance process as set forth in Exhibit C hereof.

**"Performance Guarantee Period"** means the entire period from the Guarantee Date of this Agreement until the termination or expiration of this Agreement as set forth herein.

**"Permitted Users"** means the CLIENT, its employees and agents.

**"Realized Annual Savings"** means the actual savings achieved by the CLIENT during an Annual Period, calculated as the sum of the Measured & Verified Savings plus the Stipulated Savings.

**"Savings Excess"** means the Realized Annual Savings less the Annual Guaranteed Savings for the Annual Period. If the amount is zero or greater, the Guarantee Savings in Performance Assurance, Exhibit C, has been fulfilled.

**"Savings Shortfall"** means the Realized Annual Savings less the Annual Guaranteed Savings for the Annual Period. If the amount is less than zero the Guarantee Savings in Performance Assurance, Exhibit C, has not been fulfilled.

**"Services"** means those services to be provided by SIEMENS as described in the Scope of Work and Services, Exhibit A and as described in Performance Assurance, Exhibit C.

**"Site"** shall have the same meaning as Facilities.

**"Stipulated Savings"** are the savings that have been mutually agreed upon and are stipulated to by SIEMENS and the CLIENT prior to or upon implementation of the FIMs. The Stipulated Savings cannot be changed unless agreed upon by the Parties or as set forth herein. The Stipulated Savings for each Annual Period, with the corresponding Escalation Factor if applicable, are set forth in Performance Assurance, Exhibit C.

**"Substantial Completion"** or **"Substantially Complete"** means the first to occur of the following: (i) the Work, or any identifiable portion thereof, is sufficiently complete, in accordance with the provisions of this Agreement relating to the Scope of the Work and Services, Exhibit A, that the CLIENT will be able to realize from such Work substantially all of the practical benefits intended to be gained therefrom, or otherwise to employ the Work or the FIMs associated therewith for their intended purposes; or (ii) temporary, qualified or final certificates of occupancy, if required, have been issued with spect to such portions of the Work by the appropriate public authority.

**"Technical Support Program"** or **"TSP"** is a plan detailing the tasks, material, and responsibilities provided by SIEMENS to the CLIENT during a specified time period defined in the Scope of Work and Services, Exhibit A, and/or described in the Performance Assurance, Exhibit C.

**"Term"** is a stipulated period of time starting on the Effective Contract Date of this Agreement and ending at the termination or expiration of this Agreement as set forth herein.

**"Technology Improvement Measure"** or **"TIM"** means the application of new technology methods, devices, materials and/or software as installed or instituted by SIEMENS at the Facilities for the purpose of improving the efficiency of operations activities, operational costs and/or utility costs as described in the Scope of Work and Services, Exhibit A.

**"Therm"** is a measure of energy equal to 100,000 BTUs.

**"Total Guaranteed Savings"** are the amount of savings identified to be achievable based on calculations and adjustments as set forth in Performance Assurance, Exhibit C. Total Guaranteed Savings includes all savings that SIEMENS has guaranteed for each Annual Period of the Term and may also include Construction Period Savings if specified in Performance Assurance, Exhibit C.

**"Utility Services Measure"** or **"USM"** means the application of utility services methods and technology as described in the Scope of Work and Services, Exhibit A.

**"Work"** means collective labor, equipment and services comprising the FIMs to be performed by SIEMENS as described in the Scope of Work and Services, Exhibit A.

*"Water Conservation Measure"* or *"WCM"* means the equipment, devices, materials, programs, practices, methodologies and/or software as installed or coordinated by SIEMENS at the Facility for the purpose of improving the efficiency of the acility's water consumption, as described in Scope of Work and Services, Exhibit A.

*"Waste Conservation Measure"* or *"SCM"* means the equipment, devices, materials, programs, practices, methodologies and/or software as installed or coordinated by SIEMENS at the Facility for the purpose of improving the efficiency of operations, activities, operational costs and/or operations results, as described in Scope of Work and Services, Exhibit A.

## Article 3
### General

3.1 The CLIENT hereby engages and SIEMENS hereby accepts the engagement to perform and provide the Work and Services as set forth in Exhibit A hereof and in accordance with the terms and conditions of this Agreement.

3.2 SIEMENS shall perform the Work as an independent contractor with exclusive control of the manner and means of performing the Work in accordance with the requirements of this Agreement. SIEMENS has no authority to act or make any agreements or representations on behalf of the CLIENT. This Agreement is not intended, and shall not be construed to create, between the CLIENT and SIEMENS, the relationship of principal and agent, joint venturers, co-partners or any other such relationship, the existence of which is hereby expressly denied. No employee or agent of SIEMENS shall be, or shall be deemed to be, an employee or agent of the CLIENT.

3.3 SIEMENS represents, warrants and covenants to the CLIENT that:

  (a) It has all requisite corporate power and statutory authority to enter into this Agreement, and that its execution hereof has been duly authorized and does not and will not constitute a breach or violation of any of SIEMENS' organizational documents, any applicable laws or regulations, or any agreements with third parties;

  (b) It has done and will continue to do all things necessary to preserve and keep in full force and effect its existence and the Agreement;

  (c) This Agreement is the legal, valid and binding obligation of SIEMENS, in accordance with its terms, and all requirements have been met and procedures have been followed by SIEMENS to ensure the enforceability of the Agreement;

  (d) To SIEMENS' best knowledge, there is no pending or threatened, suit, action, litigation or proceeding against or affecting SIEMENS that affects the validity or enforceability of this Agreement; and,

  (e) It is duly authorized to do business in all locations where the Work and Service are to be performed.

3.4 The CLIENT represents, warrants and covenants to SIEMENS that:

  (a) It has all requisite corporate power and statutory authority to enter into this Agreement, and that its execution hereof has been duly authorized and does not and will not constitute a breach or violation of any of the CLIENT'S organizational documents, any applicable laws or regulations, or any agreements with third parties;

  (b) It has done and will continue to do all things necessary to preserve and keep in full force and effect its existence and the Agreement;

  (c) This Agreement is the legal, valid and binding obligation of the CLIENT, in accordance with its terms, and all requirements have been met and procedures have been followed by the CLIENT to ensure the enforceability of the Agreement; and

  (d) To the CLIENT'S best knowledge, there is no pending or threatened, suit, action, litigation or proceeding against or affecting the CLIENT that affects the validity or enforceability of this Agreement.

## Article 4
### Performance Guarantee

4.1 SIEMENS guarantees that the Guaranteed Savings generated from the Guarantee Date to the last date of the Performance Guarantee Period will be no less than the Total Guaranteed Savings shown in Performance Assurance, Exhibit C. The measurement and verification calculation methodology for determining the Measured & Verified Savings is set forth in Performance Assurance, Exhibit C.

  4.1.1 <u>General</u>. Except as otherwise provided, energy savings will be calculated for each month of each Annual Savings Period as the product of (a) "units of energy saved" (kWh, Therms, GJ, etc.) multiplied by (b) "cost of energy."

(a) Units of energy saved are computed by a software application which is specified in Exhibit C. Units of energy saved are calculated by subtracting current period measured units of energy consumed from the adjusted Baseline units of energy defined in Article 5 of Exhibit C. Adjustments to the Baseline energy units are based on factors such as weather, occupancy, operating hours, etc., and changes to the Contracted Baseline conditions and operating practices as defined in Article 7 of Exhibit C.

(b) Costs of energy are defined in Article 6 of Exhibit C, Utility Rate Structures and Escalation Rates.

4.2 Any future escalation factors applied to utility, energy or other costs which are to be applied are set forth in Exhibit C. SIEMENS and the CLIENT agree that the Baseline data which is set forth in Exhibit C is an full and accurate reflection of the existing Facility, equipment, operation, business use and energy usage, and that such Baseline data will be the basis on which all future energy use will be compared in order to determine both the Annual Realized Savings and the Accumulated Realized Savings.

4.3 SIEMENS and the CLIENT agree that the Contracted Baseline defined in Exhibit C will represent the new operating and/or equipment profile of the Facility resulting from the FIM implementation. The Performance Guarantee is dependent upon and is subject to the express condition that the CLIENT operates and maintains its Facilities within the Contracted Baseline parameters during the entire term of the Performance Guarantee Period.

4.4 The CLIENT agrees to notify SIEMENS prior to or within 30 days of any:

(a) Material Change to operating schedules, strategies, equipment and conditions in the Facility from those described in the Contracted Baseline data.

(b) Any other Material Changes in or at the Facility that may increase or decrease energy usage, including without limitation: changes in operations, business conducted, occupancy, hours of operation, and energy consuming equipment and malfunctions, failures and related changes in energy consuming equipment; and

(c) Any damage to, or destruction of, the FIM Work that may result in a Material Change.

4.5 SIEMENS agrees to respond and advise the CLIENT within 30 days of the receipt of a notice of a Material Change that SIEMENS will:

(a) Continue the Performance Assurance without adjustments;

(b) Require an adjustment to the Performance Assurance as a result of the Material Change; or,

(c) Where a commercially reasonable adjustment to the Performance Guarantee is unavailable, terminate the Performance Assurance and terminate the Performance Guarantee.

4.6 Failure of the CLIENT to notify SIEMENS of a Material Change shall void the Performance Guarantee and the Performance Assurance where a commercially reasonable adjustment is unavailable and where a Savings Shortfall cannot be prevented.

4.7 Performance Guarantee Period savings reconciliation as identified in Section 4.1 will be performed at the end of each annual period as follows unless otherwise agreed:

(a) Within thirty (30) days of the Guarantee Date the Construction Savings shall be reconciled and added to the Accumulated Realized Savings;

(b) At each annual reconciliation, the Realized Annual Savings shall be applied to the Accumulated Realized Savings.

1) Should the Accumulated Realized Savings be greater than the Accumulated Guaranteed Savings, a Savings Excess shall be recorded.

2) Should the Accumulated Realized Savings be less than the Accumulated Guaranteed Savings, a Savings Shortfall shall be recorded.

(c) A Savings Shortfall shall be paid by SIEMENS within thirty (30) days following the CLIENT'S acceptance of the reconciliation and the amount paid shall be then added to calculate the Accumulated Realized Savings.

(d) If SIEMENS can correct a shortfall through an operational improvement at no material expense or material inconvenience to the CLIENT and with no future operational expenses, and the CLIENT declines to allow such operational improvement, then any future Savings Shortfall that the improvement would have corrected will be negated. The amount of such Savings Shortfall shall be added to calculate the Accumulated Realized Savings.

4.8 The Performance Guarantee is dependent upon and is subject to the express condition that the CLIENT enter into and maintain, during the entire term of the Performance Guarantee Period, the Performance Assurance TSP. If the CLIENT





fails to enter into, breaches, cancels or otherwise causes the termination of the Performance Assurance TSP this Performance Guarantee shall terminate immediately and be void and of no force or effect. The services to be provided under the Performance Assurance TSP are defined in Exhibit A.

4.9 The payments and credits based on Savings Shortfalls, if any, are the sole remedy of the CLIENT for this Performance Guarantee. Any payments made or to be made to the CLIENT under the terms of this Performance Guarantee shall not exceed the payments actually made by CLIENT to SIEMENS for the aggregate of the Contract Sum; the Performance Assurance TSP Payments; and, the CLIENT'S cost of financing the Work.

4.10 The Performance Assurance TSP is the technical service to be provided by SIEMENS to the CLIENT during the Performance Guarantee Period, commencing on the Guarantee Date. Performance Assurance TSP is defined in the Glossary and described more fully in Exhibit A.

    (a) The CLIENT represents that all existing equipment (equipment that is not installed by SIEMENS under this Agreement) deemed necessary to achieve the Performance Guarantee is in satisfactory working condition. Prior to the beginning of the Guarantee Period SIEMENS will have inspected all such existing equipment and report any deficiencies to the CLIENT.

    (b) If the existing equipment or Equipment installed by SIEMENS is altered or moved by any person, including the CLIENT, other than SIEMENS or a person authorized by SIEMENS, the CLIENT shall immediately notify SIEMENS in writing, and SIEMENS reserves the right to perform a reacceptance test on, or if necessary a re-commissioning of, the system at the CLIENT'S expense.

4.11 SIEMENS will have no liability or obligation to continue providing Performance Assurance TSP Services or any Guaranteed Savings under the Performance Guarantee in the event that the CLIENT fails to:

    (a) Authorize a re-acceptance test or re-commissioning that SIEMENS reasonably deems necessary in order to prevent a Savings Shortfall;

    (b) Provide access to any Site where Work is to be performed as required by the Contract Documents;

    (c) Service and maintain all equipment involved with the FIMs defined in the Scope of Work and Services, Exhibit A, in accordance with the manufacturers' recommendations in order to prevent a Savings Shortfall; or,

    (d) Provide SIEMENS with accurate Facility operating information, including energy usage and cost, executed preventive maintenance and repair records, building or equipment additions, and occupancy levels during each Annual Period, as soon as such information becomes reasonably available to the CLIENT.

4.12 Should the CLIENT decide to discontinue the guarantee before the end of the contract period, 30 days notice will be given and the CLIENT will select one of the following:

    (a) SIEMENS will cancel the Performance Assurance TSP and the CLIENT will re-invest the avoided cost into building improvements and services that improve the overall building(s) performance which are implemented by SIEMENS.

    (b) SIEMENS will cancel the Performance Assurance TSP and the CLIENT will pay to SIEMENS 0% of the remaining value left in the TSP Annual Period.

4.13 Unless expressly contrary to law, any disputes concerning the calculation of the Realized Annual Savings, the Accumulated Realized Savings, or changes to the Contracted Baseline under this Performance Guarantee, that are not resolved by negotiation between the Parties within thirty (30) days of the notice of the dispute, will be resolved by a third-party professional engineering firm reasonably acceptable to both SIEMENS and the CLIENT. The determination of such firm will be final and binding upon CLIENT and SIEMENS. SIEMENS and the CLIENT will each be responsible for half of the fees of such firm.

## Article 5

### Work by SIEMENS

5.1 SIEMENS will perform the Work expressly described in this Agreement and in any work release documents or change orders that are issued under this Agreement and signed by both Parties. The Work performed by SIEMENS shall be conducted in a workmanlike manner.

5.2 SIEMENS shall perform the Work during its normal working hours, Monday through Friday inclusive, excluding holidays, unless otherwise agreed herein. The CLIENT shall make the Site available in order for Work to proceed in an efficient manner.

5.3   SIEMENS is not required to conduct safety, reacceptance or other tests, install new devices or equipment or make modifications to any Equipment beyond the Scope set forth in this Agreement. Any CLIENT request to change the Scope or the nature of the Work must be in the form of a mutually agreed upon change order, effective only when executed by the Parties.

5.4   All Deliverables shall become the CLIENT'S property upon full payment to SIEMENS. SIEMENS may retain file copies of such Deliverables. All Instruments shall remain SIEMENS' property. To the extent specified in Exhibit A, Permitted Users shall have a right to make and retain copies of Instruments except uncompiled code, and to use all Instruments, provided, however, that the Instruments shall not be used or relied upon by any parties other than Permitted Users, and such use shall be limited to the particular project and location for which the Instruments were provided. All Deliverables and Instruments provided to the CLIENT are for Permitted Users' use and only for the purposes disclosed to SIEMENS. The CLIENT shall not transfer any Deliverables or copies of Instruments to others or use them or permit them to be used for any extension of the Work or any other project or purpose, without SIEMENS' express written consent. Any reuse of Deliverables or Instruments for other projects or locations without the written consent of SIEMENS, or use other than by Permitted Users, will be at Permitted Users' and such other user's sole risk and without liability to SIEMENS; and, unless expressly prohibited by law, the Permitted Users, jointly and severally shall indemnify, defend and hold SIEMENS harmless from any claims, losses or damages arising from such unauthorized use.

5.5   SIEMENS shall be responsible for any portion of the Work performed by any subcontractor of SIEMENS. SIEMENS shall not have any responsibility, duty or authority to direct, supervise or oversee any contractor of the CLIENT or their work or to provide the means, methods or sequence of their work or to stop their work. SIEMENS' work and/or presence at the Site shall not relieve others of their responsibility to the CLIENT or to others.

5.6   SIEMENS warrants that:

   (a)   Unless otherwise agreed, all Equipment shall be new and of good quality. Until one year from the date the Equipment is installed all Equipment manufactured by SIEMENS or bearing its nameplate will be free from defects in material and workmanship arising from normal use and service.

   (b)   Labor for all Work, excluding TSP Services, is warranted to be free from defects in workmanship for one year after the Works are performed. TSP services are warranted to be free from defects in workmanship for ninety (90) days after the Services are performed.

5.7   Warranty Limitation:

   (a)   The limited warranties set forth in Section 5.6 will be void as to, and shall not apply to, any Equipment (i) repaired, altered or improperly installed by any person other than SIEMENS or its authorized representative; (ii) subjected to unreasonable or improper use or storage, used beyond rated conditions, operated other than per SIEMENS' or the manufacturer's instructions, or otherwise subjected to improper maintenance, negligence or accident; (iii) damaged because of any use of the Equipment after the CLIENT has, or should have, knowledge of any defect in the Equipment; or (iv) not manufactured, fabricated and assembled by SIEMENS or not bearing SIEMENS' nameplate. However, SIEMENS assigns to the CLIENT, without recourse, any and all assignable warranties available from any manufacturer, supplier, or subcontractor of such Equipment.

   (b)   Any claim under the limited warranty granted above must be made in writing to SIEMENS within thirty (30) days after discovery of the claimed defect unless discovered directly by SIEMENS. Such limited warranty only extends to the CLIENT and not to any subsequent owner of the Equipment. The CLIENT'S sole and exclusive remedy for any Equipment or Services not conforming with this limited warranty is limited to, at SIEMENS' option: (i) repair or replacement of defective components of covered Equipment; (ii) re-performance of the defective portion of the Services; or, (iii) to the extent previously paid, the issuance of a credit or refund for the original purchase price of such defective component or portion of the Equipment or Services.

   (c)   SIEMENS shall not be required to repair or replace more than the component(s) of the Equipment or the portion of the Work and Services actually found to be defective. SIEMENS' warranty liability shall not exceed the purchase price of such item. Repaired or replaced Equipment or Services will be warranted hereunder only for the remaining portion of the original warranty period.

5.8   THE EXPRESS LIMITED WARRANTIES PROVIDED ABOVE ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, STATUTORY, EXPRESS, OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY EXPRESSLY

DISCLAIMED. SIEMENS MAKES NO WARRANTY, EXPRESS OR IMPLIED, THAT ANY EQUIPMENT PROVIDED HEREUNDER WILL PREVENT ANY LOSS, OR WILL IN ALL CASES PROVIDE THE PROTECTION FOR WHICH IT IS INSTALLED OR INTENDED. THE LIMITED EXPRESS WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS AGREEMENT MAY ONLY BE MODIFIED OR SUPPLEMENTED IN A WRITING EXECUTED BY A DULY AUTHORIZED SIGNATORY OF EACH PARTY.

5.9 SIEMENS will not be responsible for the maintenance, repair or replacement of, or Services necessitated by reason of:

(a) Non-maintainable, non-replaceable or obsolete parts of the Equipment, including but not limited to: ductwork, shell and tubes, heat exchangers, coils, unit cabinets, casings, refractory material, electrical wiring, water and pneumatic piping, structural supports, cooling tower fill, slats and basins, etc. unless otherwise specifically stated herein; or

(b) CLIENT, or a third-party's, negligence, abuse, misuse, improper or inadequate repairs or modifications, improper operation, lack of operator maintenance or skill, corrosion, erosion, improper or inadequate water treatment, electrolytic action, chemical action, failure to comply with manufacturer's operating and environmental requirements, Acts of God, or other reasons beyond SIEMENS' control. Unless expressly agreed in writing, SIEMENS is not responsible for the removal or reinstallation of replacement valves, dampers, or waterflow and tamper switches with respect to pipes and ductwork, including vent or drain system. SIEMENS ASSUMES NO RESPONSIBILITY FOR ANY SERVICE PERFORMED ON ANY EQUIPMENT OTHER THAN FOR THAT PERFORMED BY SIEMENS OR ITS AGENTS.

## Article 6
### The CLIENT'S Responsibilities

6.1 The CLIENT, without cost to SIEMENS, shall:

(a) Designate a contact person with authority to make decisions for the CLIENT regarding the Work and provide SIEMENS with information sufficient to contact such person in an emergency;

(b) Coordinate the work of contractors under CLIENT'S sole control with the Work and Services so as not to disrupt the Work and Services proceeding in an efficient manner.

(c) Provide or arrange for 24 hour, 7 day per week access and make all reasonable provisions for SIEMENS to enter any Site where Work is to be performed so that Work may proceed in an efficient manner;

(d) Permit SIEMENS to control and/or operate all building controls, systems, apparatus, equipment and machinery necessary to perform the Work;

(e) Furnish SIEMENS with blueprints, surveys, legal descriptions, waste management plans and all other available information pertinent to the Work and any Site where the Work is to be performed as may be reasonably requested by SIEMENS;

(f) Furnish SIEMENS with all approvals, permits and consents from government authorities and others as may be required for performance of the Work, except for those SIEMENS has expressly agreed in writing to obtain;

(g) In accordance with Article 11 hereof, notify SIEMENS promptly of all known or suspected Hazardous Materials at the Site, of any contamination of the Site by Oil or Hazardous Material, and of any other conditions requiring special care or which may reasonably be expected to affect the Work, and provide SIEMENS with any available documents describing the quantity, nature, location and extent of such materials, contamination or conditions;

(h) Comply with all laws and provide any notices required to be given to any government authorities in connection with the Work, except such notices SIEMENS has expressly agreed in writing to give;

(i) Provide SIEMENS with legally required materials and information (including but not limited to Material Safety Data Sheets) related to all Hazardous Materials located at any Site where the Work is to be performed;

(j) Furnish to SIEMENS any contingency plans, safety programs and other policies, plans or programs related to any Site where the Work is to be performed;

(k) Operate, service and maintain all Equipment according to the manufacturer's recommendations including those set forth in the manufacturer's operating manuals or instructions, as well as all requirements of applicable law or of authorities having jurisdiction. The CLIENT shall furnish all needed servicing and parts for said FIMs, which parts shall become part of the FIMs. Such Equipment shall be operated only in the specified operating environment, which shall be supplied by the CLIENT, including without limitation: (1) suitable electrical service,

including clean, stable, properly conditioned power, to all Equipment; (2) telephone lines, capacity and connectivity as required by such Equipment; and (3) heat, light, air conditioning or other environmental controls, and other utilities in accordance with the specifications for the Equipment;

(l) Promptly notify SIEMENS of any unusual or materially changed operating conditions, hours of usage, system malfunctions, installed equipment or building alterations that may affect the Equipment or energy usage or any Services; and

(m) If applicable, provide and pay for a dedicated voice grade dial-up phone line, or a mutually agreed communication method, and install a terminal block, or an equivalent communication mechanism, in a mutually agreed upon location. All on-line service Equipment (excluding the phone line) will remain the property of SIEMENS unless otherwise stated herein.

6.2 Unless contrary to law, the CLIENT acknowledges that the technical and pricing information contained in this Agreement is confidential and proprietary to SIEMENS and agrees not to disclose it or otherwise make it available to others without SIEMENS' express written consent.

6.3 The CLIENT acknowledges that it is now and shall at all times remain in control of the project Site. Except as expressly provided herein, SIEMENS shall not be responsible for the adequacy of the health or safety programs or precautions related to the CLIENT'S activities or operations, the CLIENT'S other contractor, the work of any other person or entity, or Site conditions. SIEMENS shall not be responsible for inspecting, observing, reporting or correcting health or safety conditions or deficiencies of the CLIENT or others at the Site. So as not to discourage SIEMENS from voluntarily addressing health or safety issues while at the Site, in the event SIEMENS does address such issues by making observations, reports, suggestions or otherwise, the CLIENT shall not hold, or attempt to hold, SIEMENS liable or responsible on account thereof.

## Article 7
### Changes and Delays

7.1 As the Work is performed, conditions may change or circumstances outside SIEMENS' reasonable control (including changes of law) may develop which would require SIEMENS to expend additional costs, effort or time to complete the Work, in which case SIEMENS will notify the CLIENT and an equitable adjustment will be made to SIEMENS' compensation and the time for performance. In the event conditions or circumstances require the Work to be suspended or terminated, SIEMENS shall be compensated for Work previously performed and for costs reasonably incurred in connection with the suspension or termination.

7.2 Either party may request additions, deletions, modifications or changes to the Work. Any such requests shall only become effective upon execution of a written agreement by authorized representatives of both parties.

7.3 SIEMENS may, in its sole discretion, substitute alternative parts, goods or equipment in the performance of the Work, provided that any such substitution shall be of an equal or better quality.

7.4 SIEMENS shall not be responsible for loss, delay, injury, damage or failure of performance that may be caused by circumstances beyond its control, including but not restricted to acts or omissions by the CLIENT or its employees, agents or contractors, Acts of God, war, civil commotion, acts or omissions of government authorities, fire, theft, corrosion, flood, water damage, lightning, freeze-ups, strikes, lockouts, differences with workmen, riots, explosions, quarantine restrictions, delays in transportation, or shortage of vehicles, fuel, labor or materials. In the event of such delay or failure, the time for performance shall be extended by a period equal to the time lost plus a reasonable recovery period and the compensation shall be equitably adjusted to compensate for additional costs SIEMENS incurs due to such delay. If any such delay exceeds sixty (60) days, SIEMENS may terminate this Agreement upon three (3) days notice to the CLIENT and the CLIENT shall promptly pay SIEMENS for the allocable portion of the Work completed and for any costs and expenses of termination and for any loss or damage incurred with respect to materials, equipment, tools and machinery, including reasonable overhead and profit.

## Article 8
### Compensation

8.1 Unless otherwise agreed in writing, SIEMENS shall be compensated for any extra work requested by the CLIENT at SIEMENS' then prevailing rates and shall be reimbursed for costs and expenses (plus reasonable profit and overhead) reasonably incurred in its performance of the Work or Services. The Contract Sum provides for, and is in consideration



of, only the Work and Services specifically included under the Scope of Work and Services, Exhibit A. All other work or services, including but not limited to the following, shall be separately billed or surcharged on a time and materials basis:

    (a) Emergency services performed at the CLIENT'S request, if inspection does not reveal any deficiency covered by the Scope of Work and Services, Exhibit A;

    (b) Work and/or services performed at the CLIENT'S request at times other than during SIEMENS normal working hours; and

    (c) Work and/or services performed on equipment not covered by the Scope of Work and Services, Exhibit A.

8.2 Unless otherwise agreed in writing, SIEMENS may invoice the CLIENT on a monthly or other progress-billing basis. Unless otherwise agreed in writing, invoices are due and payable upon receipt by the CLIENT. If the CLIENT disagrees with any portion of an invoice, it shall notify SIEMENS in writing of the amount in dispute and the reason for its disagreement within 21 days of receipt of the invoice, and shall pay the portion not in dispute.

8.3 SIEMENS may suspend or terminate the Work or Services at any time if payment is not received when due and shall be entitled to compensation for the Work or Services previously performed and for costs reasonably incurred in connection with the suspension or termination.

8.4 On amounts not paid within 30 days of invoice date, the CLIENT shall pay interest from invoice date until payment is received at the lesser of 12% per annum or the maximum rate allowed by law. the CLIENT shall reimburse SIEMENS for SIEMENS' costs and expenses (including reasonable attorneys' and witnesses' fees) incurred for collection under this Agreement.

8.5 Except to the extent expressly agreed in writing, SIEMENS' fees do not include any taxes, excises, fees, duties or other government charges related to the Work or Services, and the CLIENT shall pay such amounts or reimburse SIEMENS for any amounts it pays. If the CLIENT claims that Work or Services is subject to a tax exemption or direct payment permit, it shall provide SIEMENS with a valid exemption certificate or permit and, unless specifically prohibited by law, shall indemnify, defend and hold SIEMENS harmless from any taxes, costs and penalties arising out of the use or acceptance of same.

## Article 9

### Acceptance

When SIEMENS believes that all, or an independent, definable phase or portion, of the Work is Substantially Complete, SIEMENS will submit a Certificate of Substantial or Final Completion to the CLIENT. If the described portion of the Work as performed is Substantially Complete as defined herein, the CLIENT will accept that Work by signing the Certificate of Substantial or Final Completion and returning it to SIEMENS. If the Work is not Substantially Complete, then the CLIENT Representative shall notify SIEMENS within five (5) business days of any discrepancies and SIEMENS shall correct the Work to conform to the description of the Work set forth herein and resubmit the Certificate of Substantial or Final Completion to the CLIENT if SIEMENS agrees with the notice of discrepancies or, if SIEMENS disagrees with the notice, notify the CLIENT of its disagreement and such disagreement shall be resolved under the terms of this Agreement. If the CLIENT Representative does not deliver written notice to SIEMENS within five (5) business days of receiving the Certificate of Substantial or Final Completion, the CLIENT will be deemed to have agreed to, signed and returned the Certificate of Substantial or Final Completion. Any disputes concerning the completion or Substantial Completion of the Work will be resolved by submitting the issue to a third party professional engineering firm acceptable to both SIEMENS and the CLIENT. The determination of this firm with respect to completion or Substantial Completion will be final and binding upon the parties hereto. SIEMENS and the CLIENT shall share equally the costs or fees for such firm in connection with such dispute resolution process.

## Article 10

### Insurance and Allocation of Risk

10.1 SIEMENS shall maintain, at SIEMENS' expense, the following insurances while performing the Work and shall add the CLIENT as an "Additional Insured" to each policy that is referenced in subsections (c) through and including (e) hereof:

    (a) Workers' Compensation at the statutory amounts and limits as prescribed by applicable law.

**Siemens Building Technologies, Inc.**
**Agreement Articles**

PCA-100 **PUBLIC** version 01/01/06

(b) Employer's Liability insurance (and, where applicable, Stop Gap extended protection endorsement) limits of liability shall be:

- $1,000,000 per occurrence
- $1,000,000 Disease Policy
- $1,000,000 Each Employee

(c) SIEMENS shall carry, in the Occurrence Coverage Form, Comprehensive General Liability or Commercial General Liability, insurance covering SIEMENS' operations and providing insurance for bodily injury and property damage with limits of liability stated below and including coverage for:

- Products and Completed Operations
- Contractual Liability insuring the obligations assumed by SIEMENS in this Agreement
- Broad Form Property Damage (including Completed Operations)
- Explosion, Collapse and Underground Hazards
- Personal Injury Liability:
    — Limits of liability shall be $1,000,000 per occurrence/aggregate

(d) SIEMENS shall carry Automobile Liability Insurance in the Occurrence Coverage Form covering all owned, hired and non-owned automobiles and trucks used by or on behalf of SIEMENS providing insurance for bodily injury liability and property damage liability for the limits of:

- $1,000,000 per occurrence/aggregate

(e) SIEMENS shall carry Excess Liability Insurance in the Occurrence Coverage Form with limits of:

- $5,000,000 per occurrence/aggregate

10.2 The CLIENT will maintain, at its own expense, property insurance written on a builder's "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus the value of subsequent modifications and cost of materials supplied or installed by others, on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by SIEMENS, until final payment has been made to SIEMENS or no person or entity other then the CLIENT has an insurable interest in the property, whichever is later. The policy form shall include without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and start-up, rebuilding and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for SIEMENS' services and expenses required as result of such insured loss. If the insurance requires deductibles or retentions, the CLIENT shall pay costs not covered because of such deductibles or retentions. This insurance shall cover portions of the work off the Site, and also portions of the work in transit. Partial occupancy or use shall not commence unless the insurance company providing this insurance has consented to such partial occupancy or use by endorsement for otherwise. The CLIENT shall purchase and maintain boiler and machinery insurance which shall specifically cover such insured objects during installation and until Acceptance by the CLIENT. The insurance required by this section shall include the interests of the CLIENT, SIEMENS, subcontractor and sub-subcontractor in the Work. SIEMENS shall be included as an additional insured on each such insurance coverage. The CLIENT and SIEMENS waive all rights against each other and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss to the extent covered by the insurance required by this section and for any other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the CLIENT as fiduciary. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged. Insurance certificates shall be furnished upon request.

10.3 Risk of loss of materials and Equipment furnished by SIEMENS shall pass to the CLIENT upon their delivery to the Site, and the CLIENT shall be responsible for protecting and insuring them against theft and damage. However, until SIEMENS is paid in full, SIEMENS shall retain title for security purposes only and the right to repossess the materials and Equipment.

10.4 SIEMENS will indemnify the CLIENT from and against losses, claims, expenses and damages (including reasonable attorney's fees) for personal injury or physical damage to property (collectively "Damages"). Such indemnification

shall be solely to the extent the Damages are caused by or arise directly from SIEMENS or its employees', consultants' or agents' negligent acts or omissions or willful misconduct in connection with SIEMENS' performance of the Work. SIEMENS' obligations under this indemnity shall not extend to Damages arising out of or in any way attributable to the negligence of the CLIENT or its agents, contractors or employees. SIEMENS reserves the right to control the defense and settlement of any claim for which SIEMENS has an obligation to indemnify hereunder. UNLESS CONTRARY TO APPLICABLE LAW, IN NO EVENT SHALL THE CLIENT OR SIEMENS BE LIABLE UNDER THIS INDEMNITY OR OTHERWISE UNDER THIS AGREEMENT FOR SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING COMMERCIAL LOSS, LOSS OF USE, OR LOST PROFITS, HOWEVER CAUSED, EVEN IF SIEMENS OR THE CLIENT HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND, IN ANY EVENT, UNLESS CONTRARY TO APPLICABLE LAW, SIEMENS' AGGREGATE LIABILITY FOR ANY AND ALL CLAIMS, LOSSES OR EXPENSES ARISING OUT OF THIS AGREEMENT, OR OUT OF ANY GOODS OR SERVICES FURNISHED UNDER THIS AGREEMENT, WHETHER BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, AGENCY, WARRANTY, TRESPASS, INDEMNITY OR ANY OTHER THEORY OF LIABILITY, SHALL BE LIMITED TO THE LESSER OF $1,500,000 OR THE TOTAL COMPENSATION RECEIVED BY SIEMENS FROM THE CLIENT UNDER THIS AGREEMENT.

10.5    As to Patents and Copyrights:

(a) SIEMENS will, at its own expense, defend or at its option settle any suit or proceeding brought against the CLIENT in so far as it is based on an allegation that any Work (including parts thereof), or use thereof for its intended purpose, constitutes an infringement of any United States patent or copyright, if SIEMENS is promptly provided Notice and given authority, information, and assistance in a timely manner for the defense of said suit or proceeding. SIEMENS will pay the damages and costs awarded in any suit or proceeding so defended. SIEMENS will not be responsible for any settlement of such suit or proceeding made without its prior written consent. In case the Work, or any part thereof, as a result of any suit or proceeding so defended is held to constitute infringement or its use by the CLIENT is enjoined, SIEMENS will, at its option and its own expense, either: (i) procure for the CLIENT the right to continue using said Work; (ii) replace it with substantially equivalent non-infringing Work; or (iii) modify the Work so it becomes non-infringing.

(b) SIEMENS will have no duty or obligation to the CLIENT under Section 10.5(a) to the extent that the Work is: (i) supplied according to the CLIENT'S design or instructions wherein compliance therewith has caused SIEMENS to deviate from its normal course of performance; (ii) modified by the CLIENT or its contractors after delivery; or, (iii) combined by the CLIENT or its contractors with items not furnished hereunder and by reason of said design, instruction, modification, or combination a suit is brought against the CLIENT. In addition, if by reason of such design, instruction, modification or combination, a suit or proceeding is brought against SIEMENS, unless expressly prohibited by law, the CLIENT shall protect SIEMENS in the same manner and to the same extent that SIEMENS has agreed to protect the CLIENT under the provisions of Section 10.5(a) above.

(c) THIS SECTION 10.5 IS AN EXCLUSIVE STATEMENT OF ALL THE DUTIES OF THE PARTIES RELATING TO PATENTS AND COPYRIGHTS, AND DIRECT OR CONTRIBUTORY PATENT OR COPYRIGHT AND OF ALL THE REMEDIES OF THE CLIENT RELATING TO ANY CLAIMS, SUITS, OR PROCEEDINGS INVOLVING PATENTS AND COPYRIGHTS. Compliance with Section 10.5 as provided herein shall constitute fulfillment of all liabilities of the Parties under the Agreement with respect to the intellectual property indemnification.

10.6 The parties acknowledge that the price for which SIEMENS has agreed to perform the Work and obligations under this Agreement was calculated based upon the foregoing allocations of risk, and that each Party has expressly relied on and would not have entered into this Agreement but for such allocations of risk.

## Article 11

### Hazardous Materials Provisions

11.1    The Work does not include directly or indirectly performing or arranging for the detection, testing, handling, storage, removal, treatment, transportation, disposal, monitoring, abatement or remediation of any contamination of any Site at which Work is performed and any soil or groundwater at the Site by petroleum or petroleum products (collectively called "Oil"), asbestos, PCBs or hazardous, toxic, radioactive or infectious substances, including any substances regulated under RCRA, CERCLA or any other federal, state or local environmental laws, regulations, statutes, rules, standards or ordinances (collectively called "Hazardous Materials"), including without limitation: ionization smoke

detectors, ballasts, mercury bulb thermostats, used oil, contaminated filters, contaminated absorbents, and refrigerant. Except as expressly disclosed pursuant to Section 11.2, the CLIENT represents and warrants that there are no Hazardous Materials or Oil, present at the CLIENT'S locations where the Work is to be performed. SIEMENS will notify the CLIENT immediately if it discovers or reasonably suspects the presence of any previously undisclosed Oil or Hazardous Material. All Services have been priced and agreed to by SIEMENS in reliance on the CLIENT'S representations as set forth in this Article. The discovery or reasonable suspicion of Hazardous Materials or hazardous conditions at a Site where SIEMENS is to perform Work or of contamination of the Site by Oil or Hazardous Materials not previously disclosed pursuant to Section 11.2 shall entitle SIEMENS to suspend the Work immediately, subject to mutual agreement of terms and conditions applicable to any further Work, or to terminate the Work and to be paid for Work previously performed.

11.2    The CLIENT warrants that, prior to the execution of the Agreement, it notified SIEMENS in writing of any and all Oil or Hazardous Materials present, potentially present or likely to become present at the Site and provided a copy of any Site safety policies and information, including but not limited to lock-out and tag procedures, chemical hygiene plan, material safety data sheets, and other items covered or required to be disclosed or maintained by federal, state, or local laws, regulations or ordinances.

11.3    Regardless of whether or not Oil or Hazardous Material was disclosed pursuant to Section 11.2, the CLIENT shall be solely responsible for properly testing, abating, encapsulating, removing, disposing, remedying or neutralizing such Oil or Hazardous Materials, and for the costs thereof. Even if an appropriate change order has been entered into pursuant to Section 11.1, SIEMENS shall have the right to stop the Work until the Site is free from Oil or Hazardous Materials. In such event, SIEMENS will receive an equitable extension of time to complete the Work, and compensation for delays caused by Oil or Hazardous Materials remediation. In no event shall SIEMENS be required or construed to take title, ownership or responsibility for such Oil or Hazardous Materials. The CLIENT shall sign any required waste manifests in conformance with all government regulations, listing the CLIENT as the generator of the waste. If someone other than the CLIENT is the generator of the waste, the CLIENT shall arrange for such other person to sign such manifests.

11.4    Except where expressly prohibited by law, for separate consideration of $10 and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the CLIENT shall indemnify, defend and hold SIEMENS harmless from and against any damages, losses, costs, liabilities or expenses (including attorneys' fees) arising out of any Oil or Hazardous Materials or from the CLIENT'S breach of, or failure to perform its obligations under this Article.

## Article 12

### Miscellaneous Provisions

12.1    Notices between the parties shall be in writing and shall be hand-delivered or sent by certified mail, express courier, or acknowledged telefax properly addressed to the appropriate party. Any such notice shall be deemed to have been received when delivered in-person or when sent by telefax, or five (5) business days subsequent to deposit in the U.S. mails, or one (1) day after deposit with express courier.

12.2    Neither the CLIENT nor SIEMENS shall assign or transfer any rights or obligations under this Agreement, except that either party may assign this Agreement to its affiliates and SIEMENS may use subcontractors in the performance of the Work. Nothing contained in this Agreement shall be construed to give any rights or benefits to anyone other than the CLIENT and SIEMENS without the express written consent of both parties.

12.3    This Agreement shall be governed by and construed in accordance with the laws of the state or commonwealth within which the Facilities are located.

12.4    Unless contrary to applicable law and with the exception of disputes arising under Article 4, all disputes not resolved by negotiation between the Parties shall be resolved in accordance with the Commercial Rules of the American Arbitration Association in effect at that time, except as modified herein. All disputes shall be decided by a single arbitrator. A decision shall be rendered by the arbitrator no later than nine months after the demand for arbitration is filed, and the arbitrator shall state in writing the factual and legal basis for the award. No discovery shall be permitted. The arbitrator shall issue a scheduling order that shall not be modified except by the mutual agreement of the Parties. Judgment may be entered upon the award in the highest state or federal court having jurisdiction over the matter. Where allowed by applicable law, the prevailing Party shall recover all costs, including attorney's fees, incurred as a result of the dispute.



12.5    This Agreement and all provisions of this Agreement allocating responsibility or liability between the Parties shall survive the completion of the Work and the termination of this Agreement.

12.6    SIEMENS' performance of the Work is expressly conditioned on the CLIENT assenting to all of the terms of this Agreement, notwithstanding any different or additional terms contained in any writing at any time submitted or to be submitted to SIEMENS by the CLIENT relating to the Work, even if signed by SIEMENS, unless SIEMENS signs a written statement expressly indicating that such terms supersede the terms of this Agreement

12.7    Any provision of this Agreement found to be invalid, unlawful or unenforceable by a court of law shall be ineffective to the extent of such invalidity, and deemed severed herefrom, without invalidating the remainder of this Agreement. All other provisions hereof shall remain in full force and effect.

12.8    The waiver by a party of any breach by the other party of any term, covenant or condition hereof shall not operate as a waiver of any subsequent breach hereof. No waiver shall operate or be effective unless made in writing and executed by the party to be bound thereby.

12.9    In the event that the law or the CLIENT requires that SIEMENS procure a performance bond and/or a payment bond, SIEMENS shall provide a performance and payment bond in the amount of $5% of the total contract amount. The performance and payment bond will solely apply to the Work performed during the Construction Period and to the required statutory lien filing period thereafter. The performance and payment bond will not apply to any of the obligations included in Performance Assurance, Exhibit C.

**Article 13**

**Maintenance Services Technical Support Program**

13.1    The scope of services provided by SIEMENS for the Maintenance Services Technical Support Program (MSTSP) is stated in Exhibit A.

13.2    The CLIENT represents that all equipment not installed by SIEMENS under this Agreement and subject to a MSTSP is in satisfactory working condition. SIEMENS will have inspected all such equipment within the first thirty (30) days of MSTSP commencement or no later than the first scheduled inspection. Testing and inspection will not be deemed to be complete until all such equipment has been so tested and inspected.

13.3    If the equipment is altered or moved by any person, including the CLIENT, other than SIEMENS or a person authorized by SIEMENS, the CLIENT shall immediately notify SIEMENS in writing, and SIEMENS reserves the right to perform a reacceptance test on, or if necessary a re-commissioning of, the system at the CLIENT'S expense.

13.4    If SIEMENS reasonably determines as a result of such inspection and/or testing that any equipment requires repair or replacement, the CLIENT will be so notified and shall take corrective action within thirty (30) days, or such equipment shall be removed from coverage hereunder without further action by the parties. SIEMENS is not liable or responsible for the continued testing, maintenance, repair, replacement or operating capabilities of any portion of the equipment until it has been inspected and/or tested and has been, if necessary, restored to an acceptable initial condition at the CLIENT'S sole expense. Any services provided by SIEMENS in the course of such restoration will be separately charged, on a time and materials basis, and not included in fees paid hereunder. If individual items of equipment cannot, in SIEMENS' sole determination, be properly repaired or replaced due to age, obsolescence, lack of availability of refrigerant gas, halon gas, necessary parts, materials, compatibility or otherwise, or as a result of excessive wear or deterioration, SIEMENS may, within ten (10) days of such inspection, give written notice that it is withdrawing such items from coverage under the MSTSP and adjust the MSTSP Payments due hereunder accordingly.

13.5    If the removal of equipment from coverage would compromise or impair the integrity of the Work, Services or compliance with law of any system, then SIEMENS will provide a written statement thereof for execution by the CLIENT. The CLIENT'S failure to execute such statement within ten (10) days will void the MSTSP and release SIEMENS from any further obligations with respect to the MSTSP.

13.6    If the MSTSP scope of Services defined in this Agreement provides for equipment maintenance, repairs and/or replacements of equipment by SIEMENS, those Services are limited to restoring the proper working condition of such equipment. SIEMENS will not be obligated to provide replacement equipment that represents significant capital improvement compared to the original.   Exchanged components become the property of SIEMENS, except Hazardous Materials, which under all circumstances remain the property and responsibility of the CLIENT.

**Siemens Building Technologies, Inc.**
**Agreement Articles**

## *Article 1:* Scope of FIM Work

1.1 *Description*: Except as otherwise expressly provided herein, SIEMENS shall provide a turnkey solution for the Client's water metering system utilizing the Master Meters Dialog 3G® System. This is a wireless system fully integrated into the register of the water meter. The water meter register houses the:

- Encoder
- RF Transmitter
- Battery
- Antenna

This system also includes the following:
- 3G RF Boosters for Fixed Network
- 60 ft. Tower with FixedLinx TCP/IP Repeater
- Back-up Drive-by System
- Auxiliary Drive-by System
- 1 Year Support on MasterLinx
- 1 Year Support on Backbone Maintenance
- GPS System, Software and Plotter
- Leak Detection Correlator

This turnkey solution includes:
- Download of billing account data from the billing system
- Installation of meter endpoints
- Installation of system software and training
- Installation of new Green Tree Billing Software and training
- Upload of all critical billing account data back into the billing system
- Commissioning/verification of the system.

SIEMENS will include 200 residential meters as added inventory for replacements and reactivations. The necessary auxiliary equipment such as curb stops, lids, nuts, boxes, bolts & gaskets will be provided as required. SIEMENS will also provide training and administrative support prior to project completion to ensure a functional system.

1.2 *Specific Elements*: The Work shall include the following:
1.2.1 The following meter quantities will be installed during the implementation phase of this project:
1.2.2 Necessary curb stops, lids, boxes, nuts, bolts, & gaskets, flange fasteners, etc.
1.2.3 Installation or Retrofit of 6,575 Meters

1.3 *Technical Specifications:* The Work shall be performed in accordance with the following specifications, which are specifically incorporated herein and made part hereof:
1.3.1 Master Meter specifications as presented in Attachment 5 of the Proposal.
1.3.2 Design documents, as required, are to be developed in accordance with applicable codes, standards, and State law. Detailed design development will occur during the design phase of the project.

1.4 CLIENT's Responsibility:

Siemens Building Technologies, Inc.
Exhibit A - Scope of Work and Services

1.4.1 Weekly progress and scheduling meetings
1.4.2 Route scheduling, addresses and installed meter inventories
1.4.3 Customer database of accounts
1.4.4 Customer notification
1.4.5 Space for contractor trailer, laydown area and equipment/material storage.
1.4.6 Provide support for hard to find meter locations and system isolation assistence when needed
1.4.7 Provide a designated representative to interface with Siemens on all issues related to the project
1.4.8 As routes are completed, customer agrees to complete their inspections and sign offs according to the Siemens route acceptance and sign off procedures
1.4.9 Ongoing replacement of meters with AMI compatible meter/registers
1.4.10 Monthly number of water meter accounts throughout term
1.4.11 Monthly records of billed water, billed cost, meter size, meter number and rate schedule of customers throughout term
1.4.12 Annual listing of meters randomized for meter testing
1.4.13 Monthly purchased/pumped, sold and/or distributed water volumes from the water plant records throughout term

| Exhibit A - Table 1.2 - Meter Quantities | | |
|---|---|---|
| Item # | Item Description | Quantity |
| 1 | 5/8" x 3/4" PD/MJ Meters | 6,057 |
| 2 | 5/8" x 3/4" Inactive Meters - Material Only | 200 |
| 3 | 1" PD/MJ Meters | 278 |
| 4 | 1.5" PD/MJ Meter | 54 |
| 5 | 2" PD/MJ Meter | 153 |
| 6 | 2" Turbine Meter | 2 |
| 7 | 2" Turbine to Compound Conversion | 4 |
| 8 | 3" Turbine Meter | 1 |
| 9 | 3" Turbine to Compound Conversion | 13 |
| 10 | 3" Compound Meter | 1 |
| 11 | 4" Turbine Meter | 1 |
| 13 | 4" Compound Meter | 1 |
| 14 | 6" Turbine to Compound Conversion | 3 |
| | TOTALS | 6,775 |

Siemens Building Technologies, Inc.
Exhibit A - Scope of Work and Services

## Article 2: FIM Work Implementation Period

2.1   Commencement of Work:
2.1.1  SIEMENS shall commence the Work within 30 calendar days from the Effective
Contract Date, and shall perform the Work diligently and shall complete the Work
no later than 365 calendar days from the day of commencement.

2.2   *Milestones*: Specific scheduling milestones and coordination requirements are as
follows:

Contract Signed – 1 July 2009
Notice to Proceed – 15 July 2009
Account Database to SIEMENS – 31 July 2009
Initial Meter Order – 23 July 2009
Schedule for first 50% of meters to City - 22 August 2009
10% Complete Drive-by System – 6 September 2009
40% Complete Drive-by System - 16 October 2009
80% Complete Drive-by System - 2 December 2009
95% complete Drive-by System- 18 December 2009
100% complete Drive-by System - 5 January 2010
Complete migration to fixed-base system 31 July 2010

Weekly progress and scheduling meetings will be held to update the city staff

## Article 3: Scope of Performance Assurance Technical Support Program

3.1   Perform the testing and analysis as described in the M&V Plan of Exhibit C

3.2   One Annual M&V report each year

3.3   One Annual review of M&V report with CLIENT's staff

3.4   One Annual update presentation to CLIENT's City Council

3.5   Perform the pulling, replacement, testing and analysis as described in the M&V
Plan of Exhibit C

3.6   Automated Meter Read software maintenance and updates as available

3.7   Return of tested meters (rebuilt as required) to CLIENT's inventory

3.8   Fixed Network infrastructure maintenance

3.9   Does not include maintenance or service in regards to GreenTree Billing
Software beyond year one. The customer is responsible for ongoing annual
$9,000 (plus any annual escalation) payments to GreenTree to continue service
and maintenance after year one.

## Article 4: Scope of Maintenance Services Technical Support Program

N/A

This Exhibit is attached to and made a part of the Agreement between SIEMENS and the CLIENT.

| CLIENT: | | SIEMENS: | |
|---|---|---|---|
| Signature: | *Zach Patter* | Signature: | *Peter Kamps* |
| Printed Name: | ZACHARY PATTERSON | Printed Name: | PETER KAMPS |
| Title: | MAYOR | Title: | ~~VICE PRESIDENT~~ FINANCE & BUSINESS ADMINISTRATION |
| Date: | JUNE 10, 2009 | Date: | 7-29-09 |

NAME: _____

TITLE: __Keith E. Graham__
Counsel

TE: 7/29/09

approved by legal

molly m foley

## Article 1: Payment for Scope of FIM Work

1.1     **Price:** As full consideration of the Work as described in Exhibit A, Article 1: Scope of FIM Work, the CLIENT shall pay to SIEMENS the Contract Sum of $ 4,558,913.00 (plus applicable taxes).

1.2     **Escrow:** The CLIENT has agreed to deposit the Contract Sum in an Escrow Account at a financial institution satisfactory to both the CLIENT and SIEMENS.  All interest income and expenses to establish the Escrow Account shall be the complete responsibility of the CLIENT and the CLIENT will receive all interest earnings from the Escrow Account. SIEMENS will submit periodic invoices to the CLIENT based on the following Payment Schedule in Table 2.1 below.  The CLIENT shall be responsible for submitting the necessary documentation to the Escrow Agent for timely withdraws from the Escrow Account. The funding of the Escrow Account in an amount equal to or greater than the Price stated in Article 1.1 above shall be a condition precedent to SIEMENS obligation to perform or to continue the performance of the Work.  If the Escrow Account is not funded within 30 days from the execution of this Agreement, this Agreement shall be null and void. This 30 day funding period may be extended as mutually agreed upon in writing by both parties.  In the event that the Agreement becomes null and void as described in this paragraph and CLIENT has authorized SIEMENS to proceed with Work, CLIENT shall be obligated to reimburse SIEMENS: (i) for the Work performed to date; or (ii) as specified in CLIENT's authorization to proceed with Work.

1.3     **Timely Payments:** The CLIENT agrees to pay Siemens per Table B.1 below. CLIENT agrees to pay all invoices submitted by SIEMENS per Agreement, Article 8.

### Table B.1 – FIM Work Payment Schedule

| Project Phase | Payments ($) | Payments (%) | Schedule |
|---|---|---|---|
| Month 1 - DEA cost | $1,869,155 | 41.00% | |
| Month 2 – Equipment | $330,521 | 7.25% | |
| Month 3 - Equipment/Installation | $945,975 | 20.75% | |
| Month 4 – Installation | $341,918 | 7.50% | |
| Month 5 - Installation completion | $341,918 | 7.50% | |
| Month 6 – Punchlist | $273,535 | 6.00% | |
| | | | |
| Month 12 – Retainage | $455,891 | 10.00% | |
| | | | |
| | | | |
| | | | |
| | | | |
| **PROJECT TOTAL:** | $4,558,913 | 100.00% | |

This Exhibit is attached to and made a part of the Agreement between SIEMENS and the CLIENT.

**CLIENT:**
Signature: _Zachary Patten_
Printed Name: _ZACHARY PATTERSON_
Title: _MAYOR_
Date: _JUNE 10, 2009_

**SIEMENS:**
Signature: _Peter Kamps_
Printed Name: PETER KAMPS
Title: VICE PRESIDENT
FINANCE & BUSINESS ADMINISTRATION
Date: _7-29-09_

NAME: _____
TITLE: Keith E. Graham
Counsel
DATE: _____
7/29/09

approved by legal
molly n. foley

## Article 2: Payment for Performance Assurance Technical Support Program (PATSP)

2.1 **Price:** As full consideration of the Services as described in Exhibit A, Article 3, the CLIENT shall pay to SIEMENS the Annual Contract Sum as stated in Table B.2 below (plus applicable taxes).

2.2 **Performance Assurance Services Term:** The Term of the PATSP shall be 12 months and shall commence on Effective Guarantee Date.

2.3 **Automatic Renewal:** The PATSP shall automatically renew for successive Annual Periods beginning on the anniversary date of Effective Guarantee Date. Either party may amend the PATSP at the end of the initial term or at the end of a renewal term by giving the other party at least sixty (60) days prior written notice of such amendments. Each renewal shall be and remain subject to the terms and conditions of this Agreement. The Performance Guarantee is dependent upon and is subject to the express condition that the CLIENT enters into and maintains PATSP, during the entire term of the Performance Guarantee Period.

2.4 **Termination:** See Article 4.8 of the Agreement.

**Table B.2 – Performance Assurance Technical Support Program Payment Schedule**

| Date | Annual Payments ($) | Notes |
|---|---|---|
| Year 1 | $51,320.37 | |
| Year 2 | $48,011.35 | |
| Year 3 | $49,451.69 | |
| Year 4 | $50,935.24 | |
| Year 5 | $52,959.36 | |
| Year 6 | $55,059.08 | |
| Year 7 | $57,237.12 | |
| Year 8 | $59,496.29 | |
| Year 9 | $61,839.49 | |
| Year 10 | $64,269.74 | |
| | | |
| | | |
| | | |

This Exhibit is attached to and made a part of the Agreement between SIEMENS and the CLIENT.

CLIENT:
Signature: _Carolyn Patten_
Printed Name: _ZACHARY PATTERSON_
Title: _MAYOR_
Date: _JUNE 10, 2009_

SIEMENS:
Signature: _Peter Ramos_
Printed Name: PETER RAMOS
Title: VICE PRESIDENT
FINANCE & BUSINESS ADMINISTRATION
Date: _7-29-09_

NAME: _____
TITLE: **Keith E. Graham**
**Counsel**
DATE: _7-29-09_

approved by legal
molly m foley

Siemens Building Technologies, Inc.
Exhibit B - Payment Schedules

Exhibit B version 6/1/09

Siemens Building Technologies, Inc.
Exhibit B - Payment Schedules

**Exhibit C – Performance Assurance**          **City of McComb, Mississippi**

Exhibit C – Performance Assurance
City of McComb, Mississippi

The following Articles and Tables are hereby included and made part of this Exhibit C:

## Article 1: Summary of Articles and Total Guaranteed Savings

| | |
|---|---|
| Article 1 | Summary of Articles and Total Guaranteed Savings |
| Article 2 | Guarantee Savings Types |
| Article 3 | Guarantee Term Responsibilities of CLIENT |
| Article 4 | Measurement and Verification Plan |
| Article 5 | Baseline Data |
| Article 6 | Utility Rate Structures and Escalation Rates |
| Article 7 | Contracted Baseline Data |
| Appendix 1 | Meter Account List |
| Appendix 2 | Meter Test Results |
| Appendix 3 | Annual Consumption Data |
| Appendix 4 | Water and Sewer Rate Structures |

**Exhibit C - Table 1.1**

| Year | Annual Consumption Increase kgals |
|---|---|
| 1 | 251,714 |
| 2 | 257,307 |
| 3 | 262,901 |
| 4 | 268,494 |
| 5 | 274,088 |
| 6 | 274,088 |
| 7 | 274,088 |
| 8 | 274,088 |
| 9 | 274,088 |
| 10 | 274,088 |
| TOTAL | 2,684,945 |

**Exhibit C - Table 1.2**

| Year | Annual Water Consumption Increase $ | Annual Operational Savings $ | Capital Cost Avoidance $ | Annual Program Benefits Total $ |
|---|---|---|---|---|
| 1 | $545,565.62 | $64,400.00 | $9,000.00 | $618,965.62 |
| 2 | $557,689.30 | $66,332.00 | $9,270.00 | $633,291.30 |
| 3 | $569,812.98 | $68,321.96 | $9,548.10 | $647,683.04 |
| 4 | $581,936.66 | $70,371.62 | $9,834.54 | $662,142.82 |
| 5 | $594,060.34 | $72,482.77 | $10,129.58 | $676,672.68 |
| 6 | $594,060.34 | $74,657.25 | $10,433.47 | $679,151.05 |
| 7 | $594,060.34 | $76,896.97 | $10,746.47 | $681,703.78 |
| 8 | $594,060.34 | $79,203.88 | $11,068.86 | $684,333.08 |
| 9 | $594,060.34 | $81,579.99 | $11,400.93 | $687,041.26 |
| 10 | $594,060.34 | $84,027.39 | $11,742.96 | $689,830.69 |
| | $5,819,366.57 | $738,273.83 | $103,174.91 | $6,660,815.32 |

Exhibit C – Performance Assurance
City of McComb, Mississippi

1.1   Table 1.1 shows the CLIENT'S water/sewer unit Savings that result from water meter accuracy guarantee for Annual Period 1 of the Agreement.   Table 1.2 shows the CLIENT'S cost Savings that result from water meter accuracy guarantee and can be extrapolated from the water/sewer unit Savings shown in Table 1.1 by multiplying the water/sewer Savings by the Baseline water/sewer rates including the stipulated Escalation Rates found in Article 6.

1.2   SIEMENS cannot and does not predict fluctuations in utility rates or the cost of energy.  Therefore, the CLIENT and SIEMENS agree that the water/sewer cost Savings for each Annual Period will be calculated by multiplying the verified units of water/sewer Savings by the Annual Period's stipulated water/sewer rate and Escalation Rates and not the Annual Period's actual utility rate.

1.3   Nothing herein should be construed as to guarantee the actual billable usage increase dollars as derived from the tracking of the previously unbilled water usage.  Variables such as decreases in water rates or reduction in overall consumption by the residents of the City, or weather conditions may adversely affect the billable usage increase dollars that are realized by the CLIENT despite having realized the level of water metering as guaranteed by SIEMENS. SIEMENS GUARANTEES THE PREVIOUSLY UNBILLED WATER WILL BE METERED.  SIEMENS DOES NOT GUARANTEE THAT THE PREVIOUSLY UNBILLED WATER WILL ACTUALLY EQUATE TO THE DOLLAR SET FORTH IN TABLE 1.2 AS SIEMENS CANNOT PREDICT OR CONTROL WATER RATES.

1.4   The determination of Water/sewer Savings will follow current best practice, as defined in the IPMVP, or the FEMP Guidelines where required, unless otherwise agreed to by the Parties.

This Exhibit C comprising of 83 pages is attached to and made a part of the Agreement between SIEMENS and the CLIENT.


CLIENT:   **City of McComb, Mississippi**        SIEMENS:   **Siemens Building Technologies, Inc.**

Signature: _Zach Patt_                           Signature: _Pete Kamps_
Printed Name: _ZACHARY PATTERSON_                 Printed Name: _PETER KAMPS_
Title: _MAYOR_                                    Title: _VICE PRESIDENT FINANCE & BUSINESS ADMINISTRATION_
Date: _JUNE 10, 2009_                             Date: _7-29-09_

                                                  Signature: _____
                                                  Printed Name: _Keith E. Graham_
                                                  Title: _Counsel_
                                                  Date: _____
                                                           _7-29-09_

---

Siemens Building Technologies, Inc.
Exhibit C – Performance Assurance

approved by legal
v. 2009
molly m. riley

Exhibit C – Performance Assurance
City of McComb, Mississippi

## Article 2: Guaranteed Savings Options

2.1     Guarantee Savings Options for Water/Sewer Savings: Utilizing IPMVP, there are four guarantee savings options to measure and verify Water/sewer Savings: Option A - Retrofit Isolation: Key Parameter Measurement; Option B - Retrofit Isolation: All Parameter Measurement; Option C - Whole Facility; and, Option D – Calibrated Simulation.

Option A - Retrofit Isolation: Key Parameter Measurement. Savings are determined by field measurement of the key performance parameter(s) which define the energy use of the FIM's affected system(s) and/or the success of the project. Measurement frequency ranges from short-term to continuous, depending on the expected variations in the measured parameter, and the length of the reporting period. Parameters not selected for field measurement are estimated. Estimates can be based on historical data, manufacturer's specifications, or engineering judgment. Documentation of the source or justification of the estimated parameter is required. The plausible savings error arising from estimation rather than measurement is evaluated. The predetermined schedule for data collection, evaluation, and reporting is defined in Exhibit A, Article 3-Performance Assurance Services Program.

Option B – Retrofit Isolation: All Parameter Measurement. Savings are determined by field measurement of the energy use of the FIM-affected system. Measurement frequency ranges from short-term to continuous, depending on the expected variations in the savings and the length of the reporting period. The predetermined schedule for data collection, evaluation, and reporting is defined in Exhibit A, Article 3-Performance Assurance Services Program.

Option C - Whole Facility. Savings are determined by measuring energy use at the whole facility or sub-facility level. Continuous measurements of the entire facility's energy use are taken throughout the reporting period. The predetermined schedule for data collection, evaluation, and reporting is defined in Exhibit A, Article 3-Performance Assurance Services Program. Prior to the second Annual Period and prior to each Annual Period thereafter, the CLIENT provides an Energy Usage Confirmation to SIEMENS applicable to the forthcoming Annual Period.

Option D - Calibrated Simulation Savings are determined through simulation of the energy use of the whole facility, or of a sub-facility. Simulation routines are demonstrated to adequately model actual energy performance measured in the facility. This Option usually requires considerable skill in calibrated simulation. The predetermined schedule for data collection, evaluation, and reporting is defined in Exhibit A, Article 3-Performance Assurance Services Program. Prior to the second Annual Period and prior to each Annual Period thereafter, the CLIENT provides an Energy Usage Confirmation to SIEMENS applicable to the forthcoming Annual Period.

2.1.1.     Operational Savings: Operational Savings are Stipulated Savings derived from data provided by the CLIENT to SIEMENS that supports the stipulated outcome. Section 2.3 below identifies each source of Operational Savings, the Stipulated Savings, and any applicable Escalation Rate to be

Exhibit C – Performance Assurance
City of McComb, Mississippi

applied. Section 4.6 below describes each source of Operational Savings in detail. The Stipulated Savings will be achieved upon completion of the FIM. No further measurement or calculation will need to be performed.

2.2 Table 2.2 below summarizes the first Annual Period's Guaranteed Savings (See Article 1, Tables 1.1 and 1.2) utilizing the applicable Options as applied to the referenced FIMs valued pursuant to the agreed upon amounts identified in Article 6 hereof .

| Exhibit C - Table 2.2 - Source of Billable Usage Increase | | | | | | | |
|---|---|---|---|---|---|---|---|
| Item # | Description | Consumption at 100% Accuracy (kgals) | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 76.00% | 405,728 | 98.5% | 525,844 | 120,117 | $251,043.90 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 76.00% | 381,223 | 98.5% | 494,085 | 112,862 | $235,881.63 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 76.00% | 51,023 | 98.5% | 66,129 | 15,106 | $47,280.53 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 76.00% | 12,259 | 98.5% | 15,888 | 3,629 | $11,359.55 |
| | | 1,118,727 | | 850,233 | | 1,101,946 | 251,714 | $545,565.62 |

2.3 Table 2.3 identifies the source of Operational Savings defined and quantified by the CLIENT. The CLIENT affirms that such amounts are Stipulated Savings for purposes of calculating Annual Realized Savings and acknowledges that the Guaranteed Savings identified herein have been based on CLIENT'S affirmation. OPERATIONAL SAVINGS SHALL NOT BE MEASURED OR MONITORED DURING THE PERFORMANCE GUARANTEE PERIOD.

| Exhibit C - Table 2.3 Source of Operational Savings | | | |
|---|---|---|---|
| Description | Existing Operations | Proposed Operations | Difference |
| Salaries | $40,000.00 | | |
| Vehicle Reduction | $12,000.00 | | |
| Vehicle Fuel | $5,200.00 | | |
| Re-reads (30 per month) | $7,200.00 | | |
| Totals | | | $64,400.00 |

Annual Escalation Rate          3.00%

2.4 SIEMENS has explained to the CLIENT and the CLIENT has satisfied itself as to how Operational Savings are incorporated into the Annual Realized Savings.

2.5 The Escalation Factor applicable to the Operational Savings is 3%.

BY SIGNING BELOW, THE PARTIES CONFIRM THAT THEY HAVE REVIEWED THE INCLUDED GUARANTEE SAVINGS OPTIONS AND THEIR APPLICATION TO BE USED IN CALCULATING SAVINGS UNDER THE AGREEMENT.

CLIENT:     City of McComb, Mississippi          SIEMENS:     Siemens Building Technologies, Inc.

Signature: _Zachary Patte_                    Signature: _____
Printed Name: _ZACHARY PATTERSON_              PETER KAMPS
Title: _MAYOR_                                 Printed Name: _____
                                              VICE PRESIDENT
                                              Title: FINANCE & BUSINESS ADMINISTRATION

NAME: _____
TITLE: Keith E. Graham   2009
       Counsel
DATE: 7-29-09

Exhibit C – Performance Assurance
City of McComb, Mississippi

Date: June 10, 2009

Date: _____

Signature: _____
Printed Name: _____
Title: _____
Date: _____

Exhibit C – Performance Assurance
City of McComb, Mississippi

**Article 3: Guarantee Term Responsibilities of the CLIENT**
In addition to the CLIENT'S responsibilities under Article 6 of the Agreement, this Article details the responsibilities of the CLIENT in connection with the management and administration of the Performance Guarantee.

3.1     The CLIENT will provide a representative citywide to coordinate work and provide required data described below.

3.2     The CLIENT will provide SIEMENS with accurate facility operating information as defined below and in the Contracted Baseline article of this Exhibit C during each Annual Period, within thirty (30) days of any Material Change that may increase or decrease energy usage.

(a)     Annually provide monthly number of water meter accounts
(b)     Annually provide monthly database records of billing information including but not limited to metering dates, billing date, billed water, billed cost, meter size, meter number and address within local, state and federal privacy limitations.   This information shall only be used for the sole purposes of this Agreement.
(c)     Annually provide copies of all water and sewer rate schedules used for billing during the previous 12 month period if changed from the previous year.
(d)     Annually provide monthly purchased, pumped, and/or distributed water volumes from the water plant records

3.3     CLIENT will provide SIEMENS with copies of utility bills within thirty (30)  days of receipt by CLIENT or provide access to GreenTree Billing System.

(a)     Number of water meter accounts by size
(b)     Summary billing information on the amount of water sold by meter size
(c)     Water volume purchased, pumped and distributed from the water plant records

3.4     CLIENT will annually facilitate and coordinate utility meter testing including providing a listing of all meters installed in the system, providing access, notification and scheduling of meter replacements as deemed necessary by the CLIENT.

Siemens Building Technologies, Inc.
Exhibit C – Performance Assurance                                    v. 2009

Exhibit C – Performance Assurance
City of McComb, Mississippi

## Article 4: Measurement and Verification Plan

The following information is applicable to this Agreement:
　　Article 4.1 General Overview
　　Article 4.2 Option A - Retrofit Isolation: Key Parameter Measurement
　　Article 4.3 Option B - Retrofit Isolation: All Parameter Measurement
　　Article 4.4 Option C - Whole Facility
　　Article 4.5 Option D - Calibrated Simulation
　　Article 4.6 Operational Savings - Stipulated


4.1 **General Overview –**
　　(a) The purpose of the Measurement and Verification (M&V) Plan is to identify the methods, measurements, procedures and tools that will be used to verify the Savings for each FIM. Savings are determined by comparing prior usage, consumption or efficiencies defined as the Baseline to the selected FIMs being implemented against the post FIM implementation usage, consumption or efficiencies. The Baseline usage, consumption or efficiencies is described in this Exhibit C, Article 5. The usage, consumption or efficiencies associated with the FIM implementation is defined as the Contracted Baseline, and are described in this Exhibit C, Article 7.

4.2　Automatic Meter Reading
The underlying premise of the portion of the Performance Guarantee applicable to this FIM and of the M&V process for this FIM is that SIEMENS expects a new, positive displacement, residential water meter to mechanically wear in response to two primary factors: the amount of cumulative water and age. The meters with greater amounts of cumulative water measured at any given time are likely to be less accurate than meters with lower accumulated reading meters due to increased wear accompanying the increased amount of measured water. Secondly, age is also a contributing factor in meter accuracy. In the M&V phase, the bulk of the meters will be the same age. Thus targeting high cumulative flow meters is justified in addition to a sampling approach for the total population of meters.

Meter testing will be performed on a sampling of meters annually to provide assurance that the meters are maintaining the desired level of accuracy. Refer to the guaranteed accuracy tables, Table 4.8a and Table 4.8b. The meter information will be tested to AWWA standards and the sampling approach provides a high confidence level that the meters are maintaining the desired accuracies.

Annually, throughout the Performance Guarantee Period, the CLIENT will provide a randomized composite listing of current meters in electronic format. SIEMENS will remove, replace and test these meters both randomly for accuracy and randomly within a target group of high cumulative flow meters. If the average of the meters tested within any year is above the guaranteed accuracy, the meter accuracy will be deemed acceptable for the year.

The accuracy tests are to be based on AWWA standards for testing residential water meters per AWWA Manual M6. The formulation for that testing is as follows:

Siemens Building Technologies, Inc.
Exhibit C – Performance Assurance　　　　　　　　　　　　　　v. 2009

Exhibit C – Performance Assurance
City of McComb, Mississippi

For a true test of a water meter at all flow rates, AWWA standards recommend first testing low, medium, and high flow rates and then calculating the aggregate meter efficiency by weighted formula. The three test points (High, Med, and Low flow) are weighted 15%, 70%, and 15%. The formula for meter accuracy is as follow:

> (15% x Measured Efficiency @ High flow)
> + (70% x Measured Efficiency @ Medium flow)
> + (15% x Measured Efficiency @ Low flow)
> Average Weighted Efficiency of the Meter*

(*reference: AWWA Meter Manual M6, Fourth Edition; pg 60, "Meter Testing")

The tested meters will be subsequently returned to the water authority for use as future maintenance replacements, reactivations or for new customer accounts if the tested condition is within acceptable meter performance parameters as determined by SIEMENS. Otherwise the tested meters will be returned to the manufacturer for repair under warranty and then returned to the CLIENT's inventory.

The targeted meters are chosen based on a sort of the meter's cumulative water (water measured over its lifetime). All of the meters within 10% of their warrantee cumulative flow as shown in specification and warranty documents provided with this Agreement will be identified and a sample of these meters will be tested in addition to the random sample as identified in the table below up to a confidence and precision target of 80%/20%. The sampling guidelines of Table 7.2a will be used to select the appropriate number of meters to be tested.

The sample size for the random testing is selected to correspond to an 80% confidence level and a 20% precision level as a starting point. The specific selection of these meters is performed by a random number generator that arbitrarily selects accounts from the baseline meter account list.

| Table 4.2a Sampling Guidelines | |
|---|---|
| Confidence | 80% |
| Precision | 20% |
| Population | Number of Samples |
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 3 |
| 5-6 | 4 |
| 7-9 | 5 |
| 10-13 | 6 |
| 14-19 | 7 |
| 20-29 | 8 |
| 30-49 | 9 |
| 50-110 | 10 |
| >110 | 11 |

Exhibit C – Performance Assurance
City of McComb, Mississippi

The total count of meters to be tested is the algebraic sum of the targeted sample and the random sample.

As mentioned previously, the calculation of total additional water billed resulting from the meter retrofit project will be based on a comparison between the average efficiency of the old meter population (those meters in the baseline) and the tested efficiency of the new meters. The increase in efficiency (differential meter efficiency) is multiplied by the baseline annual cumulative water for the system or meter size grouping, as applicable. The result is the amount of recaptured water for the system or that meter group. This process is repeated for each meter group in the baseline listing, if applicable. The sum of these amounts of reclaimed water is the total amount of unbilled water under the guarantee. This calculated amount of reclaimed water is compared to the amount of reclaimed water guaranteed. If the calculated amount is higher than the guaranteed accuracy, then the Performance Guarantee is deemed achieved for that Annual Period.

In the event that the average tested meter accuracy is below the guaranteed accuracy, the sample size will be incrementally increased at the discretion of SIEMENS until the meter accuracies average above the guaranteed accuracy. At any point during the testing process, SIEMENS determines that the sampling will not prove to be equal or greater than the guaranteed accuracy; SIEMENS may discontinue the testing and implement register replacements on all remaining meters or accept the financial responsibility as calculated on the annual reconciliation of the M&V report. The revenue calculation is based upon the dollar rate schedule contained in the baseline data listed above.

Any sewerage revenue associated with the reclaimed water calculated will be included in any revenue reconciliation and are considered part of the Performance Guarantee. This approach ensures the CLIENT that the projected performance projected will be maintained throughout the term of the Agreement.

Population, installed meters and the interaction of the two are the key indicators that the capability of the water system to sell water is maintained.

Population = 13,557

If the population increases, it is reasonable to assume that the water consumption may increase. Alternately, if the population decreases, it is reasonable to assume the district water consumption may decrease at no fault of SIEMENS.

Installed meters = 6,575

If the number of installed meters increases, it is reasonable to assume that the water consumption may increase. Alternately, if the meter population decreases, it is reasonable to assume the district water consumption may decrease at no fault of SIEMENS.

The amount of annual rainfall can affect the overall consumption by the residents, by changing the amount of irrigation required to keep their lawns healthy. For the baseline period the amount of precipitation was:

Exhibit C – Performance Assurance
City of McComb, Mississippi

Annual Precipitation = 65.82 inches

The average rainfall for this location is approximately 62.15 inches, based on data provided by the National Oceanic and Atmospheric Administration (NOAA). If the rainfall increases, there should be less usage for irrigation; conversely if it is a particularly dry year, there should be an increase in irrigation to compensate at no fault of SIEMENS.

The population and the number of installed meters are key indicators of the capability of the system to provide water. However, if one is reduced and the other increases, a method to evaluate whether the system's capability has increased or decreased may be required. SIEMENS will use the following table to evaluate whether the system has effectively increased or decreased.

The basis of the calculation is that meter size is an indication of flow area. If the flow area is greater, then it is reasonable to assume that more flow can be provided than through smaller meters.

The potential for sufficient increased revenues of the CLIENT from water and sewer charges will be confirmed to meet or exceed the baseline revenues by verifying that the meter size calculation as presented in Table 4.2b for any Annual Period is greater than or equal to the base year. If any of these factors are not maintained, the absolute value of the water sold cannot be tied to accuracy improvements. If any of these key indicators are not maintained for a year in the Performance Guarantee Period, the baseline volume of water will prevail and the predicted revenue and savings will be stipulated to have occurred as guaranteed. If the meter size calculation shows a lower potential for water sales than the base year, the projected savings will be stipulated to have occurred.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Exhibit C - Table 4.2b** | | | | | | |
| Meter Size | Base Year Number of Meters | Base Year Calculation | Base Year Size x Number of Meters | Post Installation Year Number of Meters | Post Installation Calculation | Post Installation Calculation |
| 0.75 | 6,057 | 0.75 x 0.75 x 6057 = | 3,407 | AAA | 0.75 x 0.75 x AAA = | 0.5625 x AAA |
| 1 | 278 | 1 x 1 x 278 = | 278 | BBB | 1 x 1 x BBB = | 1 x BBB |
| 1.5 | 54 | 1.5 x 1.5 x 54 = | 122 | CCC | 1.5 x 1.5 x CCC = | 2.25 x CCC |
| 2 | 159 | 2 x 2 x 159 = | 636 | DDD | 2 x 2 x DDD = | 4 x DDD |
| 3 | 15 | 3 x 3 x 15 = | 135 | EEE | 3 x 3 x EEE = | 9 x EEE |
| 4 | 9 | 4 x 4 x 9 = | 144 | FFF | 4 x 4 x FFF = | 16 x FFF |
| 6 | 3 | 6 x 6 x 3 = | 108 | GGG | 6 x 6 x GGG = | 36 x GGG |
| 8 | 0 | 8 x 8 x 0 = | 0 | HHH | 8 x 8 x HHH = | 64 x HHH |
| 10 | 0 | 10 x 10 x 0 = | 0 | III | 10 x 10 x III = | 100 x III |
| 12 | 0 | 12 x 12 x 0 = | 0 | JJJ | 12 x 12 x JJJ = | 144 x JJJ |
| Totals | 6,575 | | 4,830 | SUM(AAA:JJJ) | | SUM |

IF SUM > 4829.56 then the system capacity is assumed greater or equal to the base year.

Siemens Building Technologies, Inc.
Exhibit C – Performance Assurance

v. 2009

Exhibit C – Performance Assurance
City of McComb, Mississippi

## 4.3    Operational Savings-Stipulated

### 4.3.1   Automatic Meter Reading

The operational savings for this project were developed through many conversations with CLIENT's staff. The reported operational savings used in the calculations for this project are stipulated for each Annual Period of the Performance Guarantee Period and were mutually agreed upon by the CLIENT and SIEMENS. The meter reading operational savings are agreed to occur by the reduction in effort associated with the baseline manual meter reading and the reduction in overall staff required to perform the monthly meter reading tasks.

Siemens Building Technologies, Inc.
Exhibit C – Performance Assurance

v. 2009

Exhibit C – Performance Assurance
City of McComb, Mississippi

## Article 5: Baseline Data

5.1    The annual period(s) selected as the Baseline period for the Automatic Meter Reading System starts on April 2008 and ends on March 2009. Table 5.2 outlines the utility consumption that occurred during this Baseline period. This Baseline consumption will be used as the reference that future years utility usage in order to determine the Guaranteed Savings. Note that the Sewer is based on Water metering, and therefore is not shown as a distinct measurement.

As mentioned previously, the calculation of total additional water billed resulting from the meter retrofit project will be based on a comparison between the average accuracy of the old meter population (those meters in the baseline) and the tested accuracy of the new meters. The increase in accuracy (differential meter accuracy) is multiplied by the baseline annual cumulative water for the system or meter size grouping, as applicable. The result is the amount of recaptured water for the system or that meter group. The following table shows the results of the baseline analysis and shows the amount of recaptured water for the system associated with the given meter sizes and classifications.

| | Exhibit C - Table 5.1 - Baseline Consumption | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Item # | Description | Consumption at 100% Accuracy (kgals) | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 76.00% | 405,728 | 98.5% | 525,844 | 120,117 | $251,043.90 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 76.00% | 381,223 | 98.5% | 494,085 | 112,862 | $235,881.63 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 76.00% | 51,023 | 98.5% | 66,129 | 15,106 | $47,280.53 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 76.00% | 12,259 | 98.5% | 15,888 | 3,629 | $11,359.55 |
| | | 1,118,727 | | 850,233 | | 1,101,946 | 251,714 | $545,565.62 |

This process is repeated for each meter group in the baseline listing, if applicable. The sum of these amounts of reclaimed water is the total amount of unbilled water under the guarantee.

5.1.1  Applicable codes - Federal, State (Provincial), County or Municipal codes or regulations are applicable to the use and operation of the Facility. SIEMENS will maintain the current level of Facility compliance relative to applicable codes unless specifically outlined to the contrary below. Unless specifically set forth in the Scope of Work and Services, Exhibit A, nothing herein should be construed as to require SIEMENS to provide additional work or services in the event that the current applicable code or regulation is modified.

5.4    The following attachments are included in the contracted baseline for the Automatic Meter Reading System:

Attachment 1: Meter Account List
Attachment 2: Baseline Meter Testing Data
Attachment 3: Baseline Consumption Data by Meter Size
Attachment 4: Current Rate Structures for Water and Sewer Services

Exhibit C – Performance Assurance
City of McComb, Mississippi

## Article 6: Utility Rate Structures and Escalation Rates

6.1     The Total Guaranteed Savings as reflected in Table 1.2 represent the predicted billable usage increase that can be extracted from the unbilled water that the new meters will track as is detailed in Table 1.1 when the unbilled water is converted to a dollar figure based on the formulas herein. The table is provided to show the total system benefits on an annual basis for the term of the Agreement. Nothing herein should be construed as to guarantee the actual billable usage increase dollars as derived from the tracking of the previously unbilled water usage. Variables such as decreases in water rates or reduction in overall consumption by the residents of the City, or weather conditions may adversely affect the billable usage increase dollars that are realized by the CLIENT despite having realized the level of water metering as guaranteed by SIEMENS. SIEMENS GUARANTEES THE PREVIOUSLY UNBILLED WATER WILL BE METERED. SIEMENS DOES NOT GUARANTEE THAT THE PREVIOUSLY UNBILLED WATER WILL ACTUALLY EQUATE TO THE DOLLAR SET FORTH IN TABLE 1.2 AS SIEMENS CANNOT PREDICT OR CONTROL WATER RATES.

However, in order to predict the billable usage increase in dollars the City was consulted to determine the mutually agreed upon annual rate increase to be used in these calculations. These numbers are based on the historical increases imposed by the City as well as the planned future increases. Using the baseline rate structure included in Attachment 4, the following table was generated showing the rate structures used in the calculations for the project term.

| Exhibit C - Table 6.1 Rate Schedule - Water | | | | | | |
|---|---|---|---|---|---|---|
| Item # | Description | Baseline Rate ($/kgal) | Year 1 Rate ($/kgal) | Year 2 Rate ($/kgal) | Year 3 Rate ($/kgal) | Year 4 Rate ($/kgal) |
| 1 | 1" and Below Inside City Limits - Water | $2.09 | $2.09 | $2.09 | $2.09 | $2.09 |
| 2 | 1" and Below Inside City Limits- Sewer | $2.09 | $2.09 | $2.09 | $2.09 | $2.09 |
| 3 | 1" and Below Outside City Limits - Water | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 |
| 4 | 1" and Below Outside City Limits - Sewer | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 |

| Exhibit C - Table 6.1 Rate Schedule - Water | | | | | |
|---|---|---|---|---|---|
| Year 5 Rate ($/kgal) | Year 6 Rate ($/kgal) | Year 7 Rate ($/kgal) | Year 8 Rate ($/kgal) | Year 9 Rate ($/kgal) | Year 10 Rate ($/kgal) |
| $2.09 | $2.09 | $2.09 | $2.09 | $2.09 | $2.09 |
| $2.09 | $2.09 | $2.09 | $2.09 | $2.09 | $2.09 |
| $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 |
| $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 |

Exhibit C – Performance Assurance
City of McComb, Mississippi

## Article 7: Contracted Baseline Data

7.1 The following data of this article outlines the operating characteristics that are required to be implemented under the FIM Work. This specific configuration of operating practices is the Contracted Baseline.

7.2 Parameters to be maintained during the Performance Guarantee Period are:
   (a) Water quality at or above average quality over the most recent 12 month period;
   (b) Source of water supply at or above average quality water over the most recent 12 month period from previous source of water supply used;
   (c) Water distribution integrity at or above Baseline maintenance levels; and,
   (d) Meter/AMR system compatibility with the new system.

7.3 The meter performance baseline used for ongoing comparison of future meter test results is as follows:

   (a) Baseline year (full 12 months) – April 2008 to March 2009
   (b) Specific meter accounts included in the baseline are attached in Attachment 1.
   (c) The baseline meter testing data are included as Attachment 2.
   (d) Details of annual water consumed for a consecutive 12 month period of each tested meter account, and a grand total of water consumed by these accounts is included in Attachment 3. Additionally included is a tally of the total number of meter accounts by meter size in the baseline survey list. These baseline accounts remain fixed throughout the guarantee period and are the basis for comparison throughout the entire guarantee period.
   (e) The water district's water and sewer billing rate schedules in force at the beginning of the SBT installation period are used for project development revenue calculations and are documented in Attachment 4. This will be the basis used for any financial calculations henceforth, not a water billing rate schedule from any other year.
   (f) Total population (people) in the water service area at the beginning of this guarantee period is between 13,557 based on census estimates for July 2007 as stated on City-Data.com.

7.4 The baseline 12 month year is chosen using the most recent 12 months of continuous data available for each account through the existing utility billing system.

7.5 Baseline number of meters and sizes is documented as part of the baseline. This is to assure that variances in installed meter counts and associated meter sizes are not inconsistent with the baseline. SIEMENS does not assume responsibility for loss of water consumption within the water district due to declines in installed capability to supply water.

7.6 Baseline period population (people) is documented as part of the baseline. This is to assure that variances in population increases or declines are not considered



Exhibit C – Performance Assurance
City of McComb, Mississippi

in the baseline. SIEMENS does not assume responsibility for loss of water consumption within the water district due to population declines.

7.7 Meter testing was performed on a representative sampling of meters to provide the pre-measurement system average level of accuracy for all meters. The meters were tested to AWWA standards and the sampling approach provides a high confidence level that the meters are indeed inefficient with compared to new meter accuracies.

The CLIENT provided a complete account download of historical data for each metered account including monthly consumption, meter size, meter installation data, meter serial number, billed charges, account number, account ID, etc. Using this information and a database of manufacturers' data the following charts were generated for the current meter population to determine the percentage of size and age ranges across the entire meter population.

Based on AWWA guidelines for meter sampling and testing a random sample of the meters were selected, removed from service, delivered to a third-party testing facility with the results presented in Attachment 2. The accuracy tests are to be based on AWWA standards for testing residential water meters per AWWA Manual M6. For a true test of a water meter at all flow rates, AWWA standards recommend first testing low, medium, and high flow rates and then calculating the aggregate meter efficiency by weighted formula. The three test points (High, Med, and Low flow) are weighted 15%, 70%, and 15%. The formula for meter accuracy is as follow:

> (15% x Measured Efficiency @ High flow)
> + (70% x Measured Efficiency @ Medium flow)
> + (15% x Measured Efficiency @ Low flow)
> Average Weighted Efficiency of the Meter*

(*reference: AWWA Meter Manual M6, Fourth Edition; pg 60, "Meter Testing")

7.8 The calculation of total additional water billed resulting from the meter retrofit project will be based on a comparison between the average efficiency of the old meter population (those meters in the baseline) and the tested efficiency of the new meters. The increase in efficiency (differential meter efficiency) is multiplied by the baseline annual cumulative water for the system or meter size grouping, as applicable. The result is the amount of recaptured water for the system or that meter group. This process is repeated for each meter group in the baseline listing, if applicable. The sum of these amounts of reclaimed water is the total amount of unbilled water under the guarantee.

The new meter accuracy is guaranteed for the first five years of operation with average water flows by the meter manufacturer. After year five it is assumed that the meter efficiency will de-rate for the remainder of its service life. This is the same for the existing meters and the new meters to be installed as part of this project. The following tables show the estimated efficiencies of the meters throughout the term of this project.

Exhibit C – Performance Assurance
City of McComb, Mississippi

## Table 7.9a Existing Meter Accuracy over Project Term

| Exhibit C - Table 7.9a Existing Meter Accuracy | | | | | | |
|---|---|---|---|---|---|---|
| Item # | Description | Baseline Accuracy Rate (%) | Year 1 Accuracy Rate (%) | Year 2 Accuracy Rate (%) | Year 3 Accuracy Rate (%) | Year 4 Accuracy Rate (%) |
| 1 | 1" and Below Inside City Limits - Water | 76.00% | 76.00% | 75.50% | 75.00% | 74.50% |
| 2 | 1" and Below Inside City Limits- Sewer | 76.00% | 76.00% | 75.50% | 75.00% | 74.50% |
| 3 | 1" and Below Outside City Limits - Water | 76.00% | 76.00% | 75.50% | 75.00% | 74.50% |
| 4 | 1" and Below Outside City Limits - Sewer | 76.00% | 76.00% | 75.50% | 75.00% | 74.50% |

| Exhibit C - Table 7.9a Existing Meter Accuracy | | | | | |
|---|---|---|---|---|---|
| Year 5 Accuracy Rate (%) | Year 6 Accuracy Rate (%) | Year 7 Accuracy Rate (%) | Year 8 Accuracy Rate (%) | Year 9 Accuracy Rate (%) | Year 10 Accuracy Rate (%) |
| 74.00% | 73.50% | 73.00% | 72.50% | 72.00% | 71.50% |
| 74.00% | 73.50% | 73.00% | 72.50% | 72.00% | 71.50% |
| 74.00% | 73.50% | 73.00% | 72.50% | 72.00% | 71.50% |
| 74.00% | 73.50% | 73.00% | 72.50% | 72.00% | 71.50% |

## Table 7.9b Proposed Meter Accuracy over Project Term

| Exhibit C - Table 7.9b Proposed Meter Accuracy | | | | | | |
|---|---|---|---|---|---|---|
| Item # | Description | Baseline Accuracy Rate (%) | Year 1 Accuracy Rate (%) | Year 2 Accuracy Rate (%) | Year 3 Accuracy Rate (%) | Year 4 Accuracy Rate (%) |
| 1 | 1" and Below Inside City Limits - Water | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% |
| 2 | 1" and Below Inside City Limits- Sewer | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% |
| 3 | 1" and Below Outside City Limits - Water | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% |
| 4 | 1" and Below Outside City Limits - Sewer | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% |

| Exhibit C - Table 7.9b Proposed Meter Accuracy | | | | | |
|---|---|---|---|---|---|
| Year 5 Accuracy Rate (%) | Year 6 Accuracy Rate (%) | Year 7 Accuracy Rate (%) | Year 8 Accuracy Rate (%) | Year 9 Accuracy Rate (%) | Year 10 Accuracy Rate (%) |
| 98.50% | 98.00% | 97.50% | 97.00% | 96.50% | 96.00% |
| 98.50% | 98.00% | 97.50% | 97.00% | 96.50% | 96.00% |
| 98.50% | 98.00% | 97.50% | 97.00% | 96.50% | 96.00% |
| 98.50% | 98.00% | 97.50% | 97.00% | 96.50% | 96.00% |

Siemens Building Technologies, Inc.
Exhibit C – Performance Assurance

v. 2009

AWWA Standard Tests

Meter Size: 0.625 x 0.75 (5/8" x 3/4")
Meter Type: PD (Positive Displacement)
Test Dates: 3/2/2009
Water Utility: McComb, MS

Weighted Factors
Min: 15.0%   Inter: 70.0%   Max: 15.0%

| Ref # | Manufacturer | Serial # | Reading (kgal) | Minimum Flow | | Intermediate Flow | | High Flow | | Weighted Average Accuracy (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Rate (gpm) | Accuracy (%) | Rate (gpm) | Accuracy (%) | Rate (gpm) | Accuracy (%) | |
| 1 | NEPTUNE | N/A | 2,877,370 | 0.25 | 92.0% | 2.00 | 99.0% | 15.00 | 98.0% | 97.8% |
| 2 | CRANE | N/A | 3,533,060 | 0.25 | 0.0% | 2.00 | 0.0% | 15.00 | 102.0% | 15.3% |
| 3 | BADGER | 29,936,143 | 314,600 | 0.25 | 92.0% | 2.00 | 101.0% | 15.00 | 99.0% | 99.4% |
| 4 | BADGER | 32,419,969 | 310,220 | 0.25 | 93.0% | 2.00 | 100.0% | 15.00 | 99.0% | 98.8% |
| 5 | BADGER | 33,292,660 | 51,380 | 0.25 | 0.0% | 2.00 | 99.0% | 15.00 | 100.0% | 84.3% |
| 6 | ROCKWELL | 20,468,017 | 92,770 | 0.25 | 0.0% | 2.00 | 80.0% | 15.00 | 90.0% | 69.5% |
| 7 | ROCKWELL | 26,228,853 | 987,880 | 0.25 | 0.0% | 2.00 | 92.0% | 15.00 | 95.0% | 78.7% |
| 8 | ROCKWELL | 22,169,519 | 488,510 | 0.25 | 0.0% | 2.00 | 90.0% | 15.00 | 94.0% | 77.1% |
| 9 | ROCKWELL | 22,907,953 | 762,800 | 0.25 | 0.0% | 2.00 | 88.0% | 15.00 | 94.0% | 75.7% |
| 10 | ROCKWELL | 23,983,349 | 572,900 | 0.25 | 0.0% | 2.00 | 80.0% | 15.00 | 92.0% | 69.8% |
| 11 | ROCKWELL | 25,605,210 | 321,200 | 0.25 | 0.0% | 2.00 | 85.0% | 15.00 | 95.0% | 73.8% |
| 12 | ROCKWELL | 38,074,835 | 613,020 | 0.25 | 70.0% | 2.00 | 101.0% | 15.00 | 100.0% | 96.2% |
| 13 | ROCKWELL | 24,097,164 | 958,160 | 0.25 | 0.0% | 2.00 | 74.0% | 15.00 | 93.0% | 65.8% |
| 14 | ROCKWELL | 19,811,568 | 826,770 | 0.25 | 0.0% | 2.00 | 90.0% | 15.00 | 96.0% | 77.4% |
| 15 | ROCKWELL | 24,098,579 | 257,190 | 0.25 | 0.0% | 2.00 | 66.0% | 15.00 | 86.0% | 59.1% |
| 16 | ROCKWELL | 25,988,466 | 223,940 | 0.25 | 0.0% | 2.00 | 101.0% | 15.00 | 91.0% | 84.4% |
| 17 | ROCKWELL | 19,811,758 | 448,070 | 0.25 | 0.0% | 2.00 | 88.0% | 15.00 | 95.0% | 75.9% |
| 18 | ROCKWELL | 19,811,936 | 599,860 | 0.25 | 0.0% | 2.00 | 46.0% | 15.00 | 94.0% | 46.3% |

Weighted Average Sample: 74.7%

| | Meters | Average |
|---|---|---|
| 0.625 x 0.75 PD | 18 | 74.7% |
| 0.625 x 0.75 MJ | 30 | 41.8% |
| 1 PD | 2 | 89.1% |
| 1 MJ | 1 | 1.0% |
| Totals | 51 | 51.4% |

## AWWA Standard Tests

Meter Size: 0.625 x 0.75 (5/8 x 3/4")
Meter Type: MJ (Multi-Jet)
Test Dates: 3/2/2009
Water Utility: McComb, MS

Weighted Factors — Min: 15.0%, Inter: 70.0%, Max: 15.0%

| Ref # | Manufacturer | Serial # | Reading (kgal) | Minimum Flow Rate (gpm) | Minimum Flow Accuracy (%) | Intermediate Flow Rate (gpm) | Intermediate Flow Accuracy (%) | High Flow Rate (gpm) | High Flow Accuracy (%) | Weighted Average Accuracy (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | MASTER | 2,615,249 | 1,919,250 | 0.25 | 95.0% | 1.00 | 99.0% | 15.00 | 101.0% | 98.7% |
| 2 | MASTER | 1,464,260 | 1,846,160 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 99.0% | 14.9% |
| 3 | MASTER | 2,332,365 | 1,647,360 | 0.25 | 99.0% | 1.00 | 100.0% | 15.00 | 101.0% | 100.0% |
| 4 | MASTER | 2,360,781 | 1,300,250 | 0.25 | 96.0% | 1.00 | 92.0% | 15.00 | 99.0% | 93.7% |
| 5 | MASTER | 2,512,682 | 884,090 | 0.25 | 87.0% | 1.00 | 99.0% | 15.00 | 101.0% | 97.5% |
| 6 | MASTER | 1,998,002 | 593,870 | 0.25 | 96.0% | 1.00 | 100.0% | 15.00 | 101.0% | 99.6% |
| 7 | MASTER | 4,353,134 | 2,207,840 | 0.25 | 98.0% | 1.00 | 99.0% | 15.00 | 101.0% | 99.2% |
| 8 | MASTER | 1,660,241 | 1,323,850 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 20.0% | 3.0% |
| 9 | MASTER | 329,020 | 717,630 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 32.0% | 4.8% |
| 10 | MASTER | 1,824,096 | 599,070 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 98.0% | 14.7% |
| 11 | MASTER | 1,999,252 | 1,040,080 | 0.25 | 99.0% | 1.00 | 100.0% | 15.00 | 101.0% | 100.0% |
| 12 | MASTER | 2,389,683 | 1,660,350 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 0.0% | 0.0% |
| 13 | MASTER | 1,402,283 | 1,307,690 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 90.0% | 13.5% |
| 14 | MASTER | 1,308,297 | 1,919,640 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 92.0% | 13.8% |
| 15 | MASTER | 1,464,123 | 1,940,760 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 0.0% | 0.0% |
| 16 | MASTER | 1,937,110 | 1,506,570 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 68.0% | 10.2% |
| 17 | MASTER | 1,785,140 | 1,900,970 | 0.25 | 101.0% | 1.00 | 101.0% | 15.00 | 102.0% | 101.2% |
| 18 | MASTER | 2,198,263 | 1,020,250 | 0.25 | 101.0% | 1.00 | 101.0% | 15.00 | 102.0% | 101.2% |
| 19 | MASTER | 875,007 | 1,120,780 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 0.0% | 0.0% |
| 20 | MASTER | 1,999,171 | 1,202,620 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 97.0% | 14.6% |
| 21 | MASTER | 1,999,161 | 3,778,220 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 16.0% | 2.4% |
| 22 | MASTER | 818,768 | 1,717,920 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 33.0% | 5.0% |
| 23 | MASTER | 1,206,934 | 1,398,920 | 0.25 | 0.0% | 1.00 | 47.0% | 15.00 | 13.0% | 34.9% |
| 24 | MASTER | 3,034,337 | 1,470,200 | 0.25 | 93.0% | 1.00 | 99.0% | 15.00 | 101.0% | 98.4% |
| 25 | MASTER | N/A | 1,750,070 | 0.25 | 101.0% | 1.00 | 99.0% | 15.00 | 102.0% | 99.8% |
| 26 | MASTER | 2,389,648 | 5,167,870 | 0.25 | 97.0% | 1.00 | 102.0% | 15.00 | 101.0% | 101.1% |
| 27 | MASTER | 1660272 | 1,938,470 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 46.0% | 6.9% |
| 28 | MASTER | 1215182 | 1,555,990 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 88.0% | 13.2% |
| 29 | MASTER | 1215191 | 1,286,430 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 93.0% | 14.0% |
| 30 | MASTER | 1552976 | 617,500 | 0.25 | 0.0% | 1.00 | 0.0% | 15.00 | 0.0% | 0.0% |

Weighted Average Sample: 41.8%

**AWWA Standard Tests**

Meter Size: 1 (1")
Meter Type: BD (Positive Displacement)
Test Dates:
Water Utility: McComb, MS

Weighted Factors
Min.: 15.0%
Inter.: 70.0%
Max.: 15.0%

| Ref # | Manufacturer | Serial # | Reading (kgal) | Minimum Flow Rate (gpm) | Minimum Flow Accuracy (%) | Intermediate Flow Rate (gpm) | Intermediate Flow Accuracy (%) | High Flow Rate (gpm) | High Flow Accuracy (%) | Weighted Average Accuracy (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ROCKWELL | 42686723 | 3,193,180 | 0.75 | 74.0% | 4.00 | 97.0% | 40.00 | 98.0% | 93.7% |
| 2 | ROCKWELL | 19849495 | 6,038,620 | 0.75 | 50.0% | 4.00 | 90.0% | 40.00 | 93.0% | 84.5% |

**AWWA Standard Tests**

Meter Size: 1 (1")
Meter Type: PD (Positive Displacement)
Test Dates:
Water Utility: McComb, MS

Weighted Factors:

Min: 15.0%  Inter: 70.0%  Max: 15.0%

| Ref # | Manufacturer | Serial # | Reading (kgal) | Minimum Flow | | Intermediate Flow | | High Flow | | Weighted Average Accuracy (%) |
|-------|--------------|----------|----------------|--------------|--------------|-------------------|--------------|-----------|--------------|-------------------------------|
| | | | | Rate (gpm) | Accuracy (%) | Rate (gpm) | Accuracy (%) | Rate (gpm) | Accuracy (%) | |
| 1 | ROCKWELL | 42686723 | 3,193,180 | 0.75 | 74.0% | 4.00 | 97.0% | 40.00 | 98.0% | 93.7% |
| 2 | ROCKWELL | 19849495 | 6,038,620 | 0.75 | 50.0% | 4.00 | 90.0% | 40.00 | 93.0% | 84.5% |

**AWWA Standard Tests**

Meter Size: 1 (1") 
Meter Type: MJ (Multi-Jet) 
Test Dates: 
Water Utility: McComb, MS 

Weighted Factors 

Min. 15.0% Inter. 70.0% Max. 15.0%

| Ref # | Manufacturer | Serial # | Reading (kgal) | Minimum Flow | | Intermediate Flow | | High Flow | | Weighted Average Accuracy (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Rate (gpm) | Accuracy (%) | Rate (gpm) | Accuracy (%) | Rate (gpm) | Accuracy (%) | |
| 1 | MASTER | 2621523 | 2,176,330 | 0.75 | 0.0% | 3.00 | 0.0% | 35.00 | 0.0% | 0.0% |

SIEMENS

**Appendix - Annual Calculations - Year 1**

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 76.00% | 405,728 | 98.5% | 525,844 | 120,117 | $251,043.90 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 76.00% | 381,223 | 98.5% | 494,085 | 112,862 | $235,881.63 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 76.00% | 51,023 | 98.5% | 66,129 | 15,106 | $47,280.53 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 76.00% | 12,259 | 98.5% | 15,888 | 3,629 | $11,359.55 |
| | | 1,118,727 | | 850,233 | | 1,101,946 | 251,714 | $545,565.62 |

**Appendix - Annual Calculations - Year 2**

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 75.50% | 403,058 | 98.5% | 525,844 | 122,786 | $256,622.66 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 75.50% | 378,715 | 98.5% | 494,085 | 115,370 | $241,123.45 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 75.50% | 50,688 | 98.5% | 66,129 | 15,441 | $48,331.21 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 75.50% | 12,178 | 98.5% | 15,888 | 3,710 | $11,611.99 |
| | | 1,118,727 | | 844,639 | | 1,101,946 | 257,307 | $557,689.30 |

**Appendix - Annual Calculations - Year 3**

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 75.00% | 400,389 | 98.5% | 525,844 | 125,455 | $262,201.41 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 75.00% | 376,207 | 98.5% | 494,085 | 117,878 | $246,365.26 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 75.00% | 50,352 | 98.5% | 66,129 | 15,777 | $49,381.88 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 75.00% | 12,098 | 98.5% | 15,888 | 3,791 | $11,864.42 |
| | | 1,118,727 | | 839,045 | | 1,101,946 | 262,901 | $569,812.98 |

**Appendix - Annual Calculations - Year 4**

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 74.50% | 397,720 | 98.5% | 525,844 | 128,124 | $267,780.16 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 74.50% | 373,699 | 98.5% | 494,085 | 120,386 | $251,607.07 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 74.50% | 50,016 | 98.5% | 66,129 | 16,113 | $50,432.56 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 74.50% | 12,017 | 98.5% | 15,888 | 3,871 | $12,116.86 |
| | | 1,118,727 | | 833,452 | | 1,101,946 | 268,494 | $581,936.66 |

SIEMENS

## Appendix – Annual Calculations – Year 5

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 74.00% | 395,050 | 98.5% | 525,844 | 130,794 | $273,358.92 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 74.00% | 371,191 | 98.5% | 494,085 | 122,894 | $256,848.89 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 74.00% | 49,681 | 98.5% | 66,129 | 16,448 | $51,483.24 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 74.00% | 11,936 | 98.5% | 15,888 | 3,552 | $12,369.29 |
| | | 1,118,727 | | 827,858 | | 1,101,946 | 274,088 | $594,060.34 |

## Appendix – Annual Calculations – Year 6

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 73.50% | 392,381 | 98.0% | 523,175 | 130,794 | $273,358.92 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 73.50% | 368,683 | 98.0% | 491,577 | 122,894 | $256,848.89 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 73.50% | 49,345 | 98.0% | 65,793 | 16,448 | $51,483.24 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 73.50% | 11,856 | 98.0% | 15,807 | 3,952 | $12,369.29 |
| | | 1,118,727 | | 822,264 | | 1,096,352 | 274,088 | $594,060.34 |

## Appendix – Annual Calculations – Year 7

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 73.00% | 389,712 | 97.5% | 520,506 | 130,794 | $273,358.92 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 73.00% | 366,175 | 97.5% | 489,069 | 122,894 | $256,848.89 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 73.00% | 49,009 | 97.5% | 65,458 | 16,448 | $51,483.24 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 73.00% | 11,775 | 97.5% | 15,727 | 3,952 | $12,369.29 |
| | | 1,118,727 | | 816,671 | | 1,090,759 | 274,088 | $594,060.34 |

SIEMENS

## Appendix - Annual Calculations - Year 8

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 72.50% | 387,043 | 97.0% | 517,836 | 130,794 | $273,358.92 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 72.50% | 363,667 | 97.0% | 486,561 | 122,894 | $256,848.89 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 72.50% | 48,674 | 97.0% | 65,122 | 16,448 | $51,483.24 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 72.50% | 11,694 | 97.0% | 15,646 | 3,952 | $12,369.29 |
| | | 1,118,727 | | 811,077 | | 1,085,165 | 274,088 | $594,060.34 |

## Appendix - Annual Calculations - Year 9

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 72.00% | 384,373 | 96.5% | 515,167 | 130,794 | $273,358.92 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 72.00% | 361,158 | 96.5% | 484,053 | 122,894 | $256,848.89 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 72.00% | 48,338 | 96.5% | 64,786 | 16,448 | $51,483.24 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 72.00% | 11,614 | 96.5% | 15,565 | 3,952 | $12,369.29 |
| | | 1,118,727 | | 805,483 | | 1,079,572 | 274,088 | $594,060.34 |

## Appendix - Annual Calculations - Year 10

| Item # | Description | Existing Consumption at 100% Accuracy | Existing Average Meter Accuracy (%) | Existing Consumption (kgals) | New Meter Accuracy (%) | Consumption Billed with New Meters (kgals) | Annual Consumption Increase (kgals) | Annual Consumption Increase ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1" and Below Inside City Limits - Water | 533,852 | 71.50% | 381,704 | 96.0% | 512,498 | 130,794 | $273,358.92 |
| 2 | 1" and Below Inside City Limits - Sewer | 501,609 | 71.50% | 358,650 | 96.0% | 481,545 | 122,894 | $256,848.89 |
| 3 | 1" and Below Outside City Limits - Water | 67,136 | 71.50% | 48,002 | 96.0% | 64,451 | 16,448 | $51,483.24 |
| 4 | 1" and Below Outside City Limits - Sewer | 16,130 | 71.50% | 11,533 | 96.0% | 15,485 | 3,952 | $12,369.29 |
| | | 1,118,727 | | 799,890 | | 1,073,978 | 274,088 | $594,060.34 |

Flat rate    0-3,000 gall

$ 2.09 per 1,000 gall over min - inside rate
$ 3.13 per 1,000 gall over min - outside rate

| RATES AS OF JUNE 2008 | | | | | | | |
|---|---|---|---|---|---|---|---|
| GALLONS | | 3/4 IN | 3/4 OUT | 1 IN IN | 1 IN OUT | 1 1/2 IN | 1 1/2 OUT |
| 0-3,000 | | $ 15.16 | $ 21.86 | $ 32.02 | $ 38.79 | $ 77.49 | $ 100.19 |
| codes | | 101 | 201 | 102 | 202 | 103 | 203 |
| 3,001-4,000 | | $ 17.25 | $ 24.99 | $ 34.11 | $ 41.92 | $ 79.58 | $ 103.32 |
| | | | | | | | |
| 4,001-5,000 | | $ 19.34 | $ 28.12 | $ 36.20 | $ 45.05 | $ 81.67 | $ 106.45 |
| | | | | | | | |
| 5,001-6,000 | | $ 21.43 | $ 31.25 | $ 38.29 | $ 48.18 | $ 83.76 | $ 109.58 |
| | | | | | | | |
| 6,001-7,000 | | $ 23.52 | $ 34.38 | $ 40.38 | $ 51.31 | $ 85.85 | $ 112.71 |
| | | | | | | | |
| 7,001-8,000 | | $ 25.61 | $ 37.51 | $ 42.47 | $ 54.44 | $ 87.94 | $ 115.84 |
| | | | | | | | |
| 8,001-9,000 | | $ 27.70 | $ 40.64 | $ 44.56 | $ 57.57 | $ 90.03 | $ 118.97 |
| | | | | | | | |
| 9,001-10,000 | | $ 29.79 | $ 43.77 | $ 46.65 | $ 60.70 | $ 92.12 | $ 122.10 |
| | | | | | | | |
| 10,001-11,000 | | $ 31.18 | $ 46.90 | $ 48.74 | $ 63.83 | $ 94.21 | $ 125.23 |
| | | | | | | | |
| 11,001-12,000 | | $ 33.97 | $ 50.03 | $ 50.83 | $ 66.96 | $ 96.30 | $ 128.36 |
| | | | | | | | |
| 12,001-13,000 | | $ 36.06 | $ 53.16 | $ 52.92 | $ 70.09 | $ 98.39 | $ 131.49 |
| | | | | | | | |

* Sewer rates are the same
as water rates unless no
meter on site - Flat rate of $40.00

## DELEGATION OF FINANCE SIGNATURE AUTHORITY
## SIEMENS BUILDING TECHNOLOGIES, INC.

I, **Axel Meier, Executive Vice President and CFO of Siemens Building Technologies, Inc.** (the "Corporation"), by virtue of the authority vested in me to negotiate, enter into, and sign or countersign and otherwise execute in the name, or on behalf of the Corporation, any bids, proposals, bonds, releases and waivers of liens, and any certificates, affidavits or ancillary documents in connection therewith; any licensing, qualification or registration filings, returns, certifications or questionnaires; any contracts, leases, agreements, guarantees and any certificates, affidavits or ancillary documents in connection therewith, and any releases, compromises or settlements in connection with claims or disputes arising out of any such transaction; and to file, release, respond to, settle or compromise any actions or proceedings by or against the Corporation including, but not limited to, signature of any certificates, affidavits or ancillary documents in connection therewith for and on behalf of the Corporation, do hereby delegate to and acknowledge that **Peter Kamps, Vice President, Division FBA of Siemens Building Technologies, Inc.** may exercise such authority for and on my behalf at any time or times that I shall not be present or shall otherwise be unavailable or unable to act.

I further designate and acknowledge that the signature of the person referred to above, is binding upon the Corporation in the above identified circumstances and shall have the same force and effect, as would my signature.

Dated: 06/25/2009

_____

Axel Meier
Executive Vice President, CFO
Siemens Building Technologies. Inc.


Signed before me on this 25th day of June, 2009 by Axel Meier.

_____
Notary Public for the State of Illinois, County of Lake

"OFFICIAL SEAL"
AUDREY KELLERHALS
Notary Public, State of Illinois
My Commission Expires 01/12/10

## DELEGATION OF SIGNATURE AUTHORITY
## SIEMENS BUILDING TECHNOLOGIES, INC.

I, Noe G. Bermudez, Assistant Secretary of Siemens Building Technologies, Inc. (the "Corporation"), by virtue of the authority vested in me to negotiate, enter into, and sign or countersign and otherwise execute in the name, or on behalf of the Corporation, any bids, proposals, bonds, releases and waivers of liens, and any certificates, affidavits or ancillary documents in connection therewith; any licensing, qualification or registration filings, returns, certifications or questionnaires; any contracts, leases, agreements, guarantees and any certificates, affidavits or ancillary documents in connection therewith, and any releases, compromises or settlements in connection with claims or disputes arising out of any such transaction; and to file, release, respond to, settle or compromise any actions or proceedings by or against the Corporation including, but not limited to, signature of any certificates, affidavits or ancillary documents in connection therewith for and on behalf of the Corporation, do hereby delegate to and acknowledge that Joseph Gunn, Sebastian Danziger, Keith Graham, and/or Molly Foley may exercise such authority for and on my behalf at any time or times that I shall not be present or shall otherwise be unavailable or unable to act.

further designate and acknowledge that the signature of the person referred to above, is binding upon the Corporation in the above identified circumstances and shall have the same force and effect as would my signature.

Dated: June 9, 2008

*[signature]*

**Noe G. Bermudez**
**Assistant Secretary**
**Siemens Building Technologies. Inc.**

Signed before me on this 9th day of June, 2008 by NOE G BERMUDEZ

*[signature]*
Notary Public

OFFICIAL SEAL
PAMELA MISSTY
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/12